UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

TEDDY NORRIS DAVIS, *et al*,  §
                             §
     Plaintiffs,           §
                             §
VS.                          §    CIVIL ACTION NO. 2:12-CV-166
                             §
BILLY PIERCE, *et al*,       §
                             §
     Defendants.           §

## OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

In this prisoner civil rights action, Plaintiffs Teddy Norris Davis and Robbie Dow

Goodman allege that Defendants have violated, and continue to violate, their right to

practice their Native American religion, in violation of the Religious Land Use and

Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, and the First Amendment.

Plaintiffs seek injunctive and declaratory relief from the Texas Department of Criminal

Justice, Criminal Institutions Division (TDCJ-CID), by and through the TDCJ-CID

Director William Stephens, sued in his official capacity only, to: (1) allow Plaintiffs to

smoke a communal pipe and/or a personal pipe during Native American ceremonies; (2)

provide a minimum of two pipe ceremonies per month and/or otherwise increase the

number of Native American services at the McConnell Unit; (3) allow Plaintiffs to grow

their hair and/or grow a kouplock; and (4) allow Plaintiffs to wear their medicine bags at

all times.  (D.E. 1, 16, 88).  Plaintiffs have also sued Clint Morris, the TDCJ Program

Analyst for Designated Units, claiming that he personally violated their First Amendment

free exercise rights because he failed to advocate for the rights of Native American

prisoners, including Plaintiffs, and as such, is liable in his individual capacity for monetary damages. (*See* Case No. 2:12-cv-166, Minutes Entry for 02/22/13, and D.E. 143 at pp. 1-2, Plaintiffs' SJM response).

Pending is Defendants' motion for summary judgment to deny Plaintiffs' claims (D.E. 120-122, 125), and Plaintiffs' cross-motion for summary judgment.   (D.E. 129). For the reasons stated herein, Defendants' motion is granted, and Plaintiffs' claims are dismissed with prejudice.

## I.      Jurisdiction.

The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Upon consent of the parties (D.E. 87, 102, 157), this case was referred to the undersigned United States magistrate judge to conduct all further proceedings, including entry of final judgment.  (D.E. 107).  *See* 28 U.S.C. § 636(c).

## II.     Procedural background.

The procedural history of this case has been fully and accurately detailed in previous pleadings, and is adequately reflected in the docket.  However, a brief review is presented to explain the current posture of Plaintiffs' claims against the remaining two Defendants.

Plaintiffs are prisoners in the TDCJ-CID, and are both currently confined at the McConnell Unit in Beeville, Texas.  Both Plaintiffs practice the Native American (NA) faith.[1]  On May 21, 2012, Plaintiff Davis filed his original complaint challenging as

---

[1] The Court acknowledges that neither the term "Native American faith" nor "Native American religion" adequately represents the defined belief system of the Plaintiffs or any particular Native

unconstitutional, *inter alia,* the TDCJ grooming policy requiring inmates to cut their hair, the prohibition of wearing a medicine bag, and the lack of NA services.  (D.E. 1).  He named as defendants the TDCJ-CID Director (then Rick Thaler, and now William Stephens) and Bill Pierce, the Director of the TDCJ Chaplaincy Department.

On June 21, 2012, a *Spears*[2] hearing was held with Plaintiff Davis, and he orally moved to add as defendants (1) Clint Morris, the Program Analyst for Designated Units, (2) Madeline Ortiz, the Director of Rehabilitative Programs, and (3) Shawna Mitchell, the McConnell Unit Chaplain.

On June 22, 2012, Robbie Goodman was granted leave to join as a plaintiff.  (D.E. 16).

On July 12, 2012, Plaintiffs filed a motion to add as a defendant Regional Chaplain Sam Longoria.  (D.E. 21).

On July 13, 2012, service was ordered on Defendants Thaler, Pierce, Morris, Ortiz, and Mitchell.  (D.E. 22).

On August 27, 2012, Defendants Thaler, Pierce, Morris, Ortiz, and Mitchell filed their Answer.  (D.E. 30). On August 30, 2012, Shawna Mitchell filed a Rule 12(b)(6)

---

American practitioner because the faith itself encompass a wide range of beliefs from different tribes and regions.  *See* Affidavit of Chari Bouse, Contract Native American Chaplain, MSJ App. 122 ("Currently, there are 565 federally recognized tribes… Each tribe has its own specific customs and traditions.  However, there are several 'inter-tribal' customs, and even that varies in tribes from different states.  NAs are not religious by nature, but adhere to what we call a 'way of life.'  Our people are 'monotheistic,' meaning we recognize only one Creator God or deity…").  A running similarity in the Native American faith system is the central relationship of human beings, and their bodies, to the land, nature, reality, and spirituality.  *See Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 460-61 (1988) (J. Brennan, dissenting).

[2] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

motion to dismiss (D.E. 32), to which Plaintiffs agreed (D.E. 44), and Chaplain Mitchell was dismissed from this action.  (D.E. 64).

On October 10, 2012, Defendant Morris filed a motion to dismiss arguing, *inter alia,* that Plaintiffs were attempting to hold him liable on a theory of *respondeat superior.* (D.E. 51).  On January 7, 2013, Plaintiffs' RLUIPA and § 1983 claims against Morris in his official capacity were dismissed; but the Court retained Plaintiff's free exercise claims against Morris in his individual capacity.  (*See* D.E. 65, 80).

On September 17, 2012, Plaintiffs were granted leave to add as a defendant Chaplain Longoria, (D.E. 39), and on November 1, 2012, Longoria filed a motion to dismiss.  (D.E. 56).

On November 23, 2012, Plaintiffs sought leave to file an amended complaint. (D.E. 71).  Leave was granted, and on February 11, 2013, Plaintiffs filed their Amended Complaint.[3]  (D.E. 88).

On February 22, 2013, a telephone conference was held during which Plaintiffs orally moved to dismiss all claims against Defendants Ortiz, Longoria, and Pierce. Plaintiffs retained their RLUIPA claim and First Amendment claim against the TDCJ Director, and retained their free exercise claim against Defendant Morris in his individual capacity only.

On July 8, 2013, Defendants filed the instant motion for summary judgment (D.E. 120), with an accompanying appendix, (D.E. 121-122), and supplement.[4]  (D.E. 125).

---

[3] The operative pleading is now Plaintiffs' Amended Complaint (D.E. 88), filed on February 11, 2013.

On July 19, 2013, Plaintiffs filed a motion for "summary judgment default" (D.E. 129), to which Defendants filed a response (D.E. 131).  Also on that date, William Stephens was substituted as the proper party defendant in place of Rick Thaler.

Following several extensions of time, on October 28, 2013, Plaintiffs filed a response in opposition to Defendants' summary judgment motion. (D.E. 143). Thereafter, additional time was granted for both parties to file additional supplements, responses, and replies.

## III.   Summary judgment evidence.

On April 13, 1995, Jolene Yellowquill, a Native American of Ojibwe heritage who was confined at a TDCJ unit in Gatesville, Texas, filed suit for injunctive relief in the United States District Court for the Southern District of Texas, Houston Division, seeking, *inter alia,* that the TDCJ be required to provide sacred pipe ceremonies to Native American adherents confined within the TDCJ.  (*See Yellowquill v. Scott,* Case No. 4:95-cv-1080, D.E. 1, 63).  On May 22, 1997, the Houston district court granted Yellowtail's motion for a temporary restraining order.  (*Id.,* Case No. 4:95-cv-1080 at D.E. 71). Thereafter, the parties reached a settlement.  *Id.,* D.E. 119. Although *Yellowquill* involved only one inmate, the resulting settlement agreement served as the basis for the TDCJ implementing certain policies to address the practice of the NA faith.

---

[4] On December 20, 2013, the Court granted Plaintiffs' request for a complimentary copy of the Appendix (filed at D.E. 121 and 122), to Defendants' summary judgment motion.  (*See* D.E. 150).  Because all parties have access to the Appendix, for consistency and ease, reference in this Order to the summary judgment evidence will be to "Appx" followed by a specific page citation, if appropriate.

On January 7, 1998, Plaintiff Davis identified his religious preference as Baptist when entering the TDCJ system.  (*See* Appx 100-101, relevant portions of Davis' Chaplaincy file).   On September 13, 1999, Plaintiff Davis changed his religious preference to Native American spirituality.  (Appx 101).   On May 5, 2011, Davis changed his preference to Native American Shamanism.  (Appx 101).

On November 27, 1996, Plaintiff Goodman listed his religious affiliation as Baptist when he entered the TDCJ.  (Appx 103, Goodman's Chaplaincy file).   On November 20, 1999, Goodman changed his religious preference to Native American. (Appx 103).

In November 2004, the TDCJ Offender Orientation Handbook was revised.   (*See* Appx 227-244).  The Handbook includes a grooming policy mandating that offenders maintain "good personal hygiene," brush their teeth daily, and be clean-shaven.  (Appx at 235).  As to hair length, the grooming policy states:

> Male offenders must keep their hair trimmed up the back of their neck and head.  Hair must be neatly cut.  Hair must be cut around the ears. Sideburns will not extend below the middle of the ears.  No block style, afro, natural or shag haircuts will be permitted.  No fad or extreme hairstyles /haircuts are allowed.   No mohawks, tails, or designs cut into the hair are allowed.

(Appx at 235).    The November 2004 Offender Handbook also includes the TDCJ's Tobacco Policy, stating that "[a]ll facilities within the TDCJ are designated as tobacco

free," and advising offenders found in possession of "tobacco products, paraphernalia or similar products may be charged with a disciplinary offense."[5]  (Appx at 238).

On May 8, 2006, the TDCJ instituted Administrative Directive AD-07.30 (rev. 6) regarding Procedures for Religious Programming.  (Appx 370-381).  AD-07.30 is a general statement encompassing all faith groups:

> The Texas Department of Criminal Justice extends to offenders of all faiths who are supervised or incarcerated within TDCJ operated units or contracted facilities, reasonable and equitable opportunities to pursue religious beliefs and participate in religious activities and programs that do not endanger the safe, secure, and orderly operation of the Agency.

(Appx at 370).  AD-07.30 defines such terms as "approved volunteer," "Holy Day" and "religious ceremony," and sets out general guidelines for offenders seeking to participate in religious activities.  (Appx 371-381).   AD-07.30 does not address any single faith group in particular.  *Id.*

In November 2008, the TDCJ Chaplaincy Department revised Policy 09.03 (rev. 4) to create an exception to the TDCJ tobacco ban for NA believers at pipe ceremonies.  (*See* Appx 367-369). The policy provided:

> (3)  TDCJ policy forbids the use or possession of tobacco in prison by offenders.  However, an exception to policy is in effect for Native American religious practitioners participating in the circle group prayer pipe ceremony of Native American-designated units/facilities.

. . .

---

[5] Effective March 1, 1995, the TDCJ banned the use of all tobacco products within its institutions, for both offenders and employees.  (*See* Appx 127-129).

(5) The pipe ceremony will be <u>conducted at a rate of no</u> <u>more than</u> <u>twice each month on Native American-designated</u> <u>units/facilities</u>. This is contingent upon availability of a qualified Native American chaplain, or a TDCJ approved volunteer, the pipe ceremony will be supervised and/or facilitated by one of these.

(6) The pipe ceremony will include tobacco or sage, sweet grass, kinnikkinnick, or cedar.   These may be used in combination as prescribed by Native American tradition.

(Appx 367-369) (emphasis in original).

In June 2009, the TDCJ Chaplaincy Department revised Policy 09.01 (rev. 4) in regards to general information about the religious beliefs of practitioners of the Native American faith.   (*See* Appx 414-418).   The policy addresses group worship and pipe ceremonies, smudging, and "medicine bundles." *Id.* at 417-18.

Also in June 2009, the TDCJ Chaplaincy Department revised Policy 09.02 (rev. 5) regarding medicine bags.   (*See* Appx 419-422).   Policy 09.02 provides specific information about the size of the permitted medicine bags and identifies the objects it may contain. *Id.* at 421.   In addition, it advises offenders that: "[i]n prison, wearing the medicine bag is limited to the offender's cell or immediate bunk area in a dorm setting and at religious services." *Id.* TDCJ Chaplaincy Department Policy 05.02, also addresses approved devotional items for offenders to possess, including those relevant to the NA faith.  (*See* Appx 410-413).

On March 9, 2010, TDCJ revised its Administrative Directive AD-03.83 (rev. 6), to provide that offenders who do not comply with the grooming standards are subject to disciplinary action.  (*See* Appx 245-247).

On June 16, 2011, William Chance, a Native American prisoner confined at the Michael Unit in Tennessee Colony, Texas, sued the TDCJ and certain officials in the United States District Court for the Eastern District of Texas, Tyler Division, alleging that he had been denied, *inter alia,* the right to participate in pipe ceremonies and smudging rituals in violation of RLUIPA and his First Amendment rights.  (*See Chance v. TDCJ,* Case No. 6:11-cv-435, D.E. 1).  Plaintiff Chance related that he suffers from two serious infectious diseases, Hepatitis C and Tuberculosis, and because of his communicable diseases, he could not smoke from the communal pipe used during pipe ceremonies, and he sought permission to possess a personal pipe.  *Id.*

In response to the *Chance* litigation, on September 8, 2011, a meeting was held with former TDCJ-CID Director Rick Thaler, Chaplaincy Director Bill Pierce, Program Analyst Clint Morris, and other officials to discuss the status of NA contract chaplains, the possibility of hiring full-time chaplains, and NA communal pipe services, including medical and sanitation issues, liability releases, protective covers for pipes, frequency of pipe services, costs of pipes, and the increase in NA adherents over time.  (Appx 111-114).  At the meeting, it was decided that only the Native American Chaplain could smoke the ceremonial pipe at a pipe ceremony.  (Appx 423, Affidavit of Billy Pierce, Director Chaplaincy Operations).   All Native American chaplains conducting pipe ceremonies were advised by telephone after the meeting, and the policy went into effect as of that date.  *Id.*

On May 21, 2012, the instant lawsuit was filed.  (D.E. 1).

In July 2012, the TDCJ Chaplaincy Department revised Policy 09.01 (rev. 5). (*See* Appx 198-200).   Revised Policy 09.01 provides that "only the Native American chaplain/volunteer is authorized to smoke the pipe used for the pipe service).  *Id.* at 199.

## IV.   Summary judgment standard.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence, or evaluate the credibility of witnesses.  *Id.*  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*,

819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions).   Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248.  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted."  *Caboni*, 278 F.3d at 451.  "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed."  *Anderson*, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact.  "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.

## V.      Discussion and Analysis.

### A.      Threshold determinations.

#### (1)      The *Chance* case and summary judgment.

As a threshold matter, the Court notes that a common thread throughout Plaintiffs'
RLUIPA claims is premised on the fact the TDCJ previously allowed practices that it
now seeks to prohibit.  Plaintiffs argue that, because the TDCJ followed more liberal
policies in the past, and also because other prisons allow certain practices that the TDCJ
does not, there necessarily exists a genuine issue of material fact on the issue of least
restrictive means such that summary is inappropriate as a matter of law.

The Fifth Circuit has squarely rejected the idea that a fact issue is created as to the
issue of least restrictive means simply because the TDCJ had a past policy allowing a
now-prohibited activity or that other correctional systems allow an activity that the TDCJ
prohibits. *See United States v. Chance,* 730 F.3d 404 (5th Cir. 2013).  In *Chance,* the
Native American plaintiff was seeking *inter alia*, access to a sweat lodge, and he offered
evidence that a federal correctional facility nearby provided such access.  *Id.* at 411.  The
Fifth Circuit found irrelevant the practices of other prison systems, noting that a
comparison of policies ignores "the differences between institutions and all the other
factors that might be more relevant in a given case."   *Id. (*citing *Fowler v. Crawford,*
534 F.3d 931, 934 (8th Cir. 2008)).  The Fifth Circuit concluded that the mere existence
of a prison policy that differs from a past policy or another institution's policy does not
necessarily entitle a plaintiff to survive summary judgment on his RLUIPA claim.  *Id.*
Indeed, as the *Chance* Court aptly noted: "That TDCJ or other prisons have tolerated

unsafe practices in that past is not a reason to permanently bind it to a dangerous policy."[6]  *Id.* at 412.  Rather, as will be discussed in more detail below, the RLUIPA analysis mandates a case-specific approach when analyzing the issue of least restrictive means on summary judgment, and accordingly, the Court overrules Plaintiffs' argument that a fact issue exists simply because the TDCJ previously had more liberal policies or that other penal institutions provide more services and accommodations to offenders practicing the NA faith.

### (2)    Exhaustion.

As another preliminary matter, the Court acknowledges that Defendants have moved for summary judgment to dismiss certain of Plaintiffs' claims for failure to exhaust administrative remedies.

In 1996, Congress enacted the Prison Litigation Reform Act, which mandated that no action shall be brought by a prisoner "until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The Supreme Court unanimously concluded that inmates must exhaust their administrative remedies before proceeding in federal court.  *Booth v. Churner,* 532 U.S. 731 (2001).  It has also repeatedly held that exhaustion is mandatory and is required for all actions brought by prisoners.  *Woodford v. Ngo,* 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524 (2002).  In *Jones v.*

---

[6] Other circuit courts have rejected the adoption of a per se rule or bright-line test in evaluating RLUIPA's least restrictive means issue.  *See, e.g., Mays v. Springborn,* 575 F.3d 643, 647 (7th Cir. 2009) (affirming summary judgment dismissing prisoner's free exercise claim where "the only evidence he produced was that the [forbidden items] were allowed at other prisons"); *Spratt v. R.I. Dep't of Corr.,* 482 F.3d 33, 42 (1st Cir. 2007) ("[E]vidence of policies at one prison is not conclusive proof that the same policies would work at another institution." ).

*Bock,* 549 U.S. 199, 217 (2007), the Supreme Court rejected a "name all defendants" requirement that was judicially created by the Sixth Circuit.

Plaintiff Davis' relevant grievance records are filed at Appx 001-037.  Plaintiff Goodman's relevant grievance records are filed at Appx 039-066.  In turn, Defendants have offered the Affidavit of Sandra K. Murphy, TDCJ Manager of Offender Grievances, who testifies that, based upon her review of the grievance records for both Plaintiffs, neither Davis nor Goodman submitted a grievance regarding his medicine bag.  (*See* Appx 038 (Davis), Appx 067 (Goodman)).  In their summary judgment response, Plaintiff Davis states that his medicine bag grievances were lost when TDCJ officials packed his possessions and moved him to 3-Building in retaliation for filing a grievance about the pipe ceremonies.  (D.E. 143, p. 12).  Offender Goodman claims that he filed a grievance about the medicine bag as a precursor to filing suit in state court.  (D.E. 143, p. 14).

The Court concludes that it need not resolve the exhaustion dispute because it will be more beneficial to address Plaintiffs' RLUIPA claims on the merits.  Thus, Defendants' motion for summary judgment for failure to exhaust is denied as moot.

### (3)    Sincerity of Plaintiffs' beliefs.

The last issue properly addressed at the onset of this case is the sincerity of the Plaintiffs' Native American beliefs.  *See Moussazadeh v. TDCJ,* 703 F.3d 781, 790-92 (5th Cir. 2012).  Briefly, each case turns on its particular facts.  *Id.* at 791.  The specific religious practice must be examined rather than the general scope of applicable religious tenets, and the plaintiff's "sincerity in espousing that practice is largely a matter of

individual credibility.  *Id.* at 792.  In fact, the sincerity of a plaintiff's engagement in a particular religious practice is rarely challenged.  *Id.* at 791.  As *Moussazadeh* explains, "[t]hough the sincerity inquiry is important, it must be handled with a light touch, or 'judicial shyness.'"  *Id.* at 792 (quoting *A.A. ex rel Betenbaugh v. Needville ISD,* 611 F.3d 248, 262 (5th Cir. 2010).

In this case, Defendants do not seriously challenge the Plaintiffs' beliefs, but do point out that Plaintiffs were both self-identified as Baptists when they entered the TDCJ. This fact fails to cast doubt on the credibility of either Plaintiff, and the Court finds that both Davis and Goodman are sincere in the practice of their NA faith.

## B.    The RLUIPA Standard.

Congress enacted the RLUIPA as a response to the Supreme Court's decisions in *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872 (1990) and *City of Boerne v. Flores,* 521 U.S. 507 (1997).  In *Smith,* the Supreme Court held that the Free Exercise Clause typically does not shield religiously motivated conduct from the burdens of generally applicable laws.  494  U.S. at 878-79.  Congress responded three years later by enacting the Religious Freedom Restoration Act (RFRA). In an effort to restore the level of protection that religious observations enjoyed before *Smith,* the RFRA mandated that "government"—including state and local governments— "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless such a burden met a "compelling governmental interest" and "least restrictive means" test.  42 U.S.C. § 2000bb-1.  In

*Flores,* the Court declared the RFRA's application to the States unconstitutional because it exceeded Congress's Fourteenth Amendment enforcement power.  521 U.S. at 532-36.

In response to the *Flores* decision, Congress enacted RLUIPA, predicating its enactment not only on its power to enforce the Fourteenth Amendment, but also on its Spending and Commerce powers.   RLUIPA targets two areas: land-use regulation and institutions that receive federal funds.  With respect to its protection of institutionalized persons, the RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution … even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (A)  is in furtherance of a compelling governmental interest; and
>
> (B)   is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  The Act broadly defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  *Id.* § 2000cc-5(7)(A).   Under the RLUIPA, the plaintiff bears the burden to prove that the challenged law, regulation or practice substantially burdens his exercise of religion.  Once a plaintiff has made this *prima facie* showing, the defendant bears the burden to prove that the challenged regulation is the least restrictive means of furthering a compelling governmental interest.  *Id.,* § 2000cc-2(b).  *And see Sossamon v. Texas,* 131 S. Ct. 1651 (2011).

Despite RLUIPA's express purpose to protect the religious observances of individualized persons, the statute does not give courts carte blanche to second-guess the reasoned judgments of prison officials.  Indeed, while Congress enacted the RLUIPA to address the many "frivolous or arbitrary" barriers impeding institutionalized persons' religious exercise, it nevertheless anticipated that courts entertaining RLUIPA challenges "would accord 'due deference to the experience and expertise of prison and jail administrators.'"  *Cutter v. Wilkinson,* 544 U.S.709, 716-17 (2005) (*quoting* 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sens. Hatch and Kennedy on the RLUIPA)).  The Supreme Court has cautioned that "[w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety," and "an accommodation must be measured so that it does not override other significant interests."  *Id.* at 722.  The Court further instructed:

> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns.  While the Act adopts a "compelling governmental interest" standard, context matters in the application of that standard. Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions.  They anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

*Id.* at 722-23 (internal quotation marks and citations omitted).  This deference is not, however, unlimited, and "policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the Act's requirements." *Rich v.*

*Secretary, Florida Dep't of Corrections,* 716 F.3d 525, 533 (11th Cir. 2013) (internal quotation marks omitted).

    **C.**    **Application of RLUIPA Standard to this Case.**

    **(1)**    **The policies complained of present a substantial burden on Plaintiffs' ability to practice their faith.**

Under RLUIPA**,** the Plaintiffs must initially demonstrate that a government practice imposes a "substantial burden" on their religious exercise, which requires the Court to determine: (1) whether the burdened activity is "religious exercise," and if so, (2) is the burden "substantial"? *Adkins v. Kaspar,* 393 F.3d 559, 567 (5th Cir. 2004). RLUIPA defines "religious exercise" to include "any exercise of religion," whether or not compelled by, or central to, a system of religious beliefs." *Id.* A government action or regulation creates a substantial burden on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs. *Id.* at 570.

Plaintiffs Davis and Goodman argue that certain TDCJ policies impose a substantial burden on their ability to practice their NA faith. In particular, Plaintiffs complain about the TDCJ's: (1) ban on communal and individual pipes; (2) lack of twice-monthly NA services; (3) the TDCJ grooming policy that prohibits long hair and/or a kouplock; and (4) the TDCJ's ban on medicine bags being worn outside of an offender's cell or living area.

Plaintiffs complain that they are denied the right to personally smoke from the sacred pipe during pipe ceremonies.  Plaintiffs maintain that the pipe ceremonies enable the participants to establish a personal relationship with the Creator through a direct dialogue, which can only be accomplished by personally inhaling and exhaling the smoke from the pipe.  (D.E. 147 at 17).  For the Spirits to answer a NA participant's prayers, "he must make a personal offering to them by personally smoking the pipe." *Id.*  Plaintiffs argue that their desire to practice the sacred pipe ceremony in this manner is consistent with the NA faith and is the method practiced by many other Native Americans, both incarcerated and outside of the prison setting.  *Id.*

 Plaintiffs' NA faith is practiced and reinforced in ceremonies and gatherings with other NA believers.  Plaintiffs claim that Defendants have denied them the right to congregate with other Native Americans on a regular basis because they have failed to provide volunteer chaplains to conduct and/or oversee ceremonies.

Another tenet of Plaintiffs' NA faith is to grow their hair and to cut it only in cases of mourning.  (*See* Transcript of June 21, 2012 evidentiary hearing, D.E. 26 at 39).[7] However, the TDCJ grooming policy requires that male offenders must keep their hair trimmed up the back of their neck and head, and also trimmed around the ears.  (Appx 227-244, at 235).   If an offender refuses to comply with the grooming standards, he is subject to disciplinary charges that can result in the loss of privileges, and possibly,

---

[7] Plaintiff Davis testified: "TDCJ has this policy stating that no inmates are supposed to be able to inflict harm on another inmate.  For the past 16 years, they've been allowing an inmate to forcefully cut my – a living part of my body – mutilate it …"  (D.E. 26, p. 39).

adversely affect time-earning classification and good time credits.   (Appx 245-247).
Plaintiffs suggest that, as a proposed compromise to long hair, they be permitted to wear
a kouplock, that is, a 2" x 2" square patch of hair at the base of the skull which may grow
continuously.  (D.E. 143 at 13; D.E. 143-1 at 12-17).

Finally, Plaintiffs maintain that Defendants have substantially burdened their
religious exercise by not allowing them to wear medicine bags at all times, including
when they walk to chow,  are at recreation, or socializing in common areas.  Plaintiffs
believe that the medicine bag and its contents help protect them from evil spirits.

In *Atkins v. Kaspar,* the Fifth Circuit noted that it held under RFRA that
circumscribing the use of a medicine bag did not rise to the level of a substantial burden
on a prisoner's NA practice, but grooming regulations did.[8]   *Atkins,* 393 F.3d at 568, n.
35 (citing *Diaz v. Collins,* 114 F.3d 69 (5th Cir. 1997)).  However, given the Supreme
Court's mandate to examine RLUIPA claims on a fact-specific case-by-case basis, the
Court concludes that Plaintiffs' have met their summary judgment burden to establish
that the complained-of TDCJ policies and practices place a substantial burden on their
religious exercise of their NA faith.

---

[8]  In *Odneal v. Pierce*, 324 Fed. Appx. 297, *2-3 (5th Cir. Apr. 3, 2009), the Fifth Circuit
reversed this Court's § 1915A dismissal of the plaintiff's RLUIPA claims concerning his
medicine bag and kouplock because this Court mistakenly applied the "legitimate penological
interests" test of *Turner v. Safley*, 482 U.S. 78 (1987) and not the RLUIPA's heightened standard
of review.  The fact that the *Odneal* decision was reversed and remanded on the kouplock and
medicine bag claims, however, does not mean the Fifth Circuit found TDCJ's policies regarding
the kouplock or medicine bags to be a substantial burden on Odneal's religious exercise.  To the
contrary, because it was a § 1915A dismissal, there was no factual record created.  Thus the
*Odneal* case has little or no bearing on the case *sub judice*.

(2)     **Least restrictive means.**

Having established substantial burden under RLUIPA, the burden now shifts to Defendants to demonstrate that the challenged policies are the least restrictive means of furthering a compelling governmental interest.   42 U.S.C. § 2000cc-1(a); *Chance v. TDCJ*, 730 F.3d 404, 410 (5th Cir. 2013).

(a)     *Smoking and/or possessing a pipe.*

Under current TDCJ policy, the contract NA chaplain or authorized NA volunteer is the only individual permitted to smoke the pipe.  (*See* Appx 201-203, October 12, 2012 Inter-Office Memorandum Re: "Policy regarding Native American pipe service").  Offenders are permitted to handle the pipe prior to its lighting.  *Id.* at 202.

Prior to this change in policy, Plaintiffs and other NA offenders were allowed to smoke a communal sacred pipe.  However, several NA offenders filed administrative grievances with the TDCJ complaining about the risk of communicable disease transmission from a communal pipe, prompting TDCJ officials to seek a medical opinion from Dr. Robert Williams, Deputy Director of TDCJ's Health Service Division.  (*See Chance,* 730 F.3d at 413 (noting that, prior to Chance filing his lawsuit, other NA inmates had raised health concerns about the communal pipe)).   In his opinion, Dr. Williams concludes:

> There is no way to share an object designed to be placed in one's mouth outside of a clinical setting with enough certainty that diseases cannot be transmitted for Health Services to advocate instituting this practice.  If it is determined that [TDCJ's] obligation to allow observance of this practice outweighs [TDCJ's] obligation to prevent spread of infection in our institutionalized setting, [TDCJ] will have to take as effective measures as are feasible, but it should be understood

> that the repercussions of this practice may extend beyond the participants since they would subsequently expose others with whom they have close contact to any disease they contracted from participating in the practice.

(See Appx 115-120 at 116, Affidavit of Dr. Williams, dated June 10, 2013, citing to his previous opinion that is also cited in *Chance*).  Based on Dr. Williams' recommendation, the TDCJ determined that it would no longer permit a communal pipe ceremony. Although a form of the sacred pipe ceremony would still be held, only the chaplain conducting the service would be allowed to smoke the pipe and pray on behalf of those present.  (*See* Appx 201-203, October 12, 2012 Inter-Office Memorandum Re: "Policy Regarding Native American pipe service").  The uncontested evidence establishes that the change in the communal pipe policy was based on the TDCJ's compelling interest in preventing the spread of diseases.

Plaintiffs argue that the TDCJ's new pipe ceremony is an insufficient accommodation of their religious exercise under RLUIPA because personal participation in the pipe ceremony is essential.  Conceding the medical concerns, Plaintiffs argue that, with respect to the least restrictive means, NA adherents should be allowed to possess their own personal pipe, and that the pipes could be stored in-between ceremonies by the prison chaplain in his or her office.

The TDCJ previously considered the idea of NA practitioners possessing personal pipes, but concluded that the security risks and associated costs were too great, and that a pipe smoked only by the ceremony leader is indeed the least restrictive means.  For example, on September 8, 2011, Defendant Morris, Director Pierce, and numerous TDCJ

officials met to discuss various issues concerning Native American ceremonies.  (Appx 111-114).  It was noted that pipe ceremonies were conducted at the Daniel Unit with a shared pipe, and a discussion followed regarding medical and sanitation issues, and liability releases.  *Id.* at 111-112.  Security issues were discussed, and it was noted that tobacco distributed for the pipe ceremony at the Daniels Unit "kept disappearing."  *Id.* at 112.  The group discussed personal pipes for Native American offenders, but concluded personal pipes would create too great of a security concern and burden, and the cost was great.  *Id.* at 113.  It was noted that the Cherokee Nation of Texas, the Lakota Nation and the Apache Nation were not interested in assisting with the cost or donation of personal pipes as they believed the offenders had "lost the right to take of the pipe."  *Id.* at 114. The group reached a consensus that there be: (1) no communal offender pipes; (2) no offender-owned or possessed pipes allowed; (3) no storage of offender-possessed pipes or pipe herbs by the TDCJ; and (4) Native Americans be provided with one pipe ceremony per month, with smoking to be done only by the volunteer/chaplain.  *Id.* at 114.

Robert Eason is the TDCJ-CID Deputy Director of Prison and Jail Operations. (Appx 425-445, Affidavit of Robert Eason).  Mr. Eason has been a TDCJ employee for over twenty years and has personal experience in the areas of prison staffing, budgets, and security review.  *Id.* at 425.  Mr. Eason related that, as part of the September 8, 2011 meeting, TDCJ officials examined whether individual pipes would be feasible as the least restrictive means, and it was noted at the onset that: "Pipe ceremonies in which offenders are allowed to smoke and handle contraband, such as pipes, tobacco and fire starting materials present serious challenges to the safety, security, and operation of a unit."  *Id.* at

428.  In addition, it would take considerable time to distribute, inventory, and track every Native American believer's pipe for every pipe ceremony.  *Id.*  Additional logistical problems are created by the necessity of cataloguing and storing several hundred pipes. *Id.* Mr. Eason explained that disposable pipes, assuming availability, would not be a feasible alternative.  *Id.* This is because tobacco is banned in Texas prisons, and is considered valuable contraband.  *Id.* The TDCJ would have to devote extensive manpower to ensure that none of the pipe ceremony participants stole or hid a pipe.  *Id.*

As to the McConnell Unit in particular, Mr. Eason pointed out that, due to the boom in the hydraulic fracturing industry on the Eagle Ford Shale, wages and the cost of living have increased in the area, and the TDCJ is not able to compete with the oil and gas salaries available, resulting in severe staff shortages.  (Appx 425-445, at 437). Indeed, on Mr. Eason's last visit to the McConnell Unit on June 27, 2013, only 37 of the 99 correctional officers working there were assigned to that unit; the other 62 are assigned to other units and were working overtime.  *Id.* at 47.

In *Chance v. TDCJ,* the Fifth Circuit considered essentially the same evidence as is now before this Court in regards to pipe ceremonies, including Dr. Williams' medical opinion and Mr. Eason's costs and security analysis.  *Id.* 730 F.3d at 412-414.  The Fifth Circuit concluded that the TDCJ had met its burden of establishing that the ban on communal and individual pipes, and allowing only the ceremony leader to smoke the pipe at ceremonies, was the least restrictive means to conduct pipe ceremonies, and accordingly, not in violation of RLUIPA.  In this case, the TDCJ has presented even more compelling evidence to support this same conclusion given the documented staff

shortages at the McConnell Unit.  Thus, Defendants are entitled to summary judgment in their favor on Plaintiffs' RLUIPA challenge to the TDCJ pipe policy.

      *(b)*      ***Frequency of NA ceremonies.***

Plaintiffs claim that the *Yellowtail* decision mandated pipe ceremonies twice a month, with additional ceremonies for holy days.  Defendants do not object to the idea of bi-monthly services as well as holy days, but instead, offer the affidavit of TDCJ Director of Chaplaincy Operations Billy Pierce detailing the efforts and difficulties in hiring and paying contract chaplains, as well as finding qualified NA volunteers.  (Appx 402-409).  Director Pierce, who testified also in the *Chance* lawsuit, provides a detailed statement as to the Chaplaincy Department's search for assistance from May 2009 through June 2013:

> TDCJ seeks to obtain as many volunteers as possible to assist with NA services. The NA chaplains attempt to recruit volunteers to assist him or her in conducting prayer circles at as many additional units as possible. I personally have made numerous attempts to locate persons who adhere to NA spirituality as both volunteers and paid contract chaplains. I routinely send letters and make telephone calls to each of the 60+ known NA resource groups in the region, but rarely get a response or follow-up commitment from these tribes and organizations.
>
> Along with sending letters, the Chaplaincy Department has diligently worked to try to find volunteers and contract chaplains to conduct NA services at McConnell and other units.  In 2009, a poster was developed which encourages participating volunteers to help other faith groups by serving as a volunteer or finding others who will do so.  It was posted at all units at a location where volunteers would see it. All TDCJ chaplains were enlisted in the recruitment effort.  At volunteer appreciation events and other volunteer meetings, those in attendance are asked to help by being volunteers for other faith groups.
>
> In addition, considerable efforts have been made to find either an unpaid volunteer or a paid contract chaplain to conduct monthly

NA services.   In November 2009, the Chaplaincy contacted the Alabama Coushatta tribe: there was no response.  The same day, Chaplaincy contacted Sammy Gutierrez from the Tigua Indians of Yselta del San Pueblo in El Paso, Texas.  Mr. Gutierrez said he was unavailable due to geographic location.  In February 2010, Chaplaincy contacted Professor Lara-Lisa Condello of the Nicola Valley Institute of Technology, Institute of Indigenous Government of Canada.  She was unavailable due to distance and geographic location.  On February 12, 2010, Chaplaincy contacted Dr. PeSheWa of the NA Church of Strawberry Plains Tennessee.  She was unavailable due to distance and geographic location, but offered her advice if needed.  In March 2010, Chaplaincy contacted Kent Frazier from "Without Reservation" and he provided NA and Christian recordings.

In March 2010, Chaplaincy contacted Dr. Bob Pierce and proceeded to hire him as a NA contract chaplain as of May 2010.  In May 2010, Regional Chaplain Sam Longoria visited with Javier Loera, a tribal historic and preservation officer of the Tigua of Ysleta del Sur Pueblo; at that time no volunteers were available due to distance and geographic location.  NA volunteer Sam Lonewolf starting providing services at the Michael Unit in July 2010 until November 2010.   From December 2010 through March 2011, Chaplaincy staff regularly recorded Dr. Bob Pierce's services at the central unit.  In March 2011, NA contract chaplain Chari Bouse started NA services at Michael, Hughes, Mountain View, Crain, and Murray units.   In October 2011, NA contract chaplain Richard VanWormer started religious services at the Stevenson unit.   In November 2011, NA contract chaplain Ed Hernandez started NA services at Daniel, Connally, McConnell and Terrell units.

In April 2012, NA contract chaplain Chari Bouse recruited two volunteers who went through volunteer training.  These volunteers attended one service and then decided that volunteering in prison was not for them.  In March 2012, Chaplaincy contacted Doug Tapper from "Storyteller" radio program and he provided NA and Christian readings.  In April 2012, NA contract chaplain Ed Hernandez was hired as a State Chaplain I at the Estelle Unit, where he performs a teaching circle once a month.  He provides NA services once a month for offenders on the Terrell unit. He has also contacted the Alabama Coushatta tribe about volunteering and providing services for TDCJ. In May 2012, Chaplaincy hired volunteer Shawna Mitchell as a NA contract chaplain for Daniel, McConnell, and Connally units. She performs the pipe ceremony once a month on each of the units. On

> November 10, 2012, the Committee on Native American Ministries from the United Methodist Church met with Chaplaincy and decided to promote a First Nations Family Heritage Day event for the offenders' family members at the South Apache Museum in Houston, Texas.  Flyers were sent to each of the NA designated units to be placed on the Chaplaincy Bulletin Board and each contract NA presented the information to the NA offenders during their NA service.

(Appx 402-409, Pierce Aff't, dated July 5, 2013, at 405-406).

Director Pierce's affidavit establishes that the primary reason more frequent services cannot be held is not the result of any TDCJ policy, but instead, is the dearth of available people willing and able to oversee religious ceremonies.  This same opinion is echoed by Defendant Morris in his affidavit.  (*See* Appx 357-360). The summary judgment evidence shows that, pursuant to longstanding TDCJ policy, prisoners may only organize religious gatherings under the proper supervision of a contract chaplain or qualified outside volunteer.  Despite efforts to hire NA chaplains and continuous requests to more than 60-plus NA resource groups in the region, Director Pierce was unable to obtain anything but religious recordings and vague commitments to help.  Similarly, Defendant Morris has traveled to various cities in Texas and has spoken with leaders of numerous tribes in an attempt to find volunteers and/or recruit chaplains.  (Appx 358-59). More recently, these efforts have proven successful.  Indeed, following a low of monthly services in 2012 at the McConnell Unit when only nine (9) NA services were conducted in a year, for the months of January 2013 through June 2013, the McConnell Unit had nineteen (19) NA services.  (Appx 403).

The Fifth Circuit has considered challenges by inmates of other faiths regarding the frequency of services. The volunteer policy has been reviewed and upheld on numerous occasions.  *See Mayfield*, 529 F.3d at 613-14; *McAlister v. Livingston*, 348 Fed. Appx. 923, 936-37 (5th Cir. 2009); *Newby v. Quarterman*, 325 Fed. Appx. 345, 350-52 (5th Cir. 2009).   Moreover, in *Chance v. TDCJ,* the Fifth Circuit expressly rejected the plaintiff's RLUIPA complaint about the frequency of services due to the limited number of outside volunteers, finding that the volunteer policy itself is reasonable and necessary, and "that it is the least restrictive means of furthering TDCJ's compelling interest in prison administration." *Chance,* 730 F.3d at 414-15.   Although *Chance* involved an inmate at the Michael Unit, the summary judgment evidence establishes that the difficulties in finding qualified chaplains and volunteers is prevalent across Texas, adversely affecting all TDCJ prison units.  Much of the evidence in this case is the same or updated versions of the evidence presented in *Chance,* and accordingly, Plaintiffs' RLUIPA claim based on the frequency of NA services is foreclosed.

### (c)    *Wearing long hair or a kouplock.*

As previously noted, Plaintiffs successfully established that the TDCJs grooming policy imposes a substantial burden on their religious exercise, and therefore, the burden shifts to Defendants to demonstrate that the challenged grooming policy is the least restrictive means of achieving the compelling government interest behind the policy. *Garner v. Kennedy,* 713 F.3d 237, 241-42 (5th Cir. 2013).   Plaintiffs' suggest that the policy is not the least restrictive because women prisoners can wear their hair longer.

Defendants contend that the grooming policy requiring short hair serves multiple compelling TDCJ interests related to both security and costs.

In support of their position, Defendants offer, *inter alia*, the affidavit of Tracy Bailey, the current senior warden at the Estelle Unit Huntsville, Texas.  (Appx 248-252, Bailey Aff't at 248).  Warden Bailey has been employed by the TDCJ for over 21 years and has held the positions of Correctional Officer, Sergeant, Lieutenant, Captain, Major and Assistant Warden.  *Id.*  Acknowledging that TDCJ women offenders can wear their hair longer than TDCJ men, Warden Bailey states that the policy "reflects the difference in the in-prison conduct of male and female offenders."  *Id.*  The TDCJ has a much greater male population than female.  *Id.* at 249.  From fiscal years 2009 to 2012, the male population ranged from a low of 140,310 to a high of 144,036, while the female population ranged between a low of 11,954 to a high of 12,486, approximately a 12:1 ratio.  *Id.* "Based on the vast difference in number of male and female offenders, it is logical that male disciplinary offenses of escape, attempted escape, assaults on a correctional officer would greatly outnumber the female number of disciplinaries."  *Id.* Indeed, the data demonstrates that a TDCJ male offender is 12 times more likely to commit an offense than a female offender, and those offenses are more serious, involving physical injury and/or attempted escapes.  *Id.*  Statistics also show that TDCJ male offenders demonstrate a higher rate per capita of disobedience and violence toward correctional officers.  *Id.* at 249-51.  Warden Bailey testified that, from a security perspective, because men are considerably more likely to be disciplined for a felony in prison than a female, the grooming policy must be strict.  *Id.*

TDCJ Regional Director Robert Eason testified that the grooming policy impacts the TDCJ's compelling interests in both security and costs. (Appx 425-445, at 441). Mr. Eason first observes that longer hair would necessarily result in increased searches and increased physical contact between officers and offenders in the "strike zone." *Id.* at 438. Currently, correctional officers are trained to keep an arms-length distance between themselves and offenders, and with an inmate's hair no longer than the collar, visible inspections are effective and the officer need not touch the inmate. *Id.* If an inmate is allowed to wear long hair or even a braid, the hair must be searched, thus diverting the attention of the officer from supervising the larger population to focus on a single prisoner. *Id.* In addition, searching an offender's hair takes time, and time pressures impact the entire unit schedule and the ability to move offenders. *Id.*

In addition to exposing officers to more risk and negatively impacting time and schedules, Mr. Eason notes that long hair can be used against the offender himself if assaulted or otherwise engaged in a physical confrontation. (Eason Aff't, Appx at 439). Long hair or a braid allows another inmate to grab the hair and control the victim. *Id.*[9] Mr. Eason points out that the TDCJ is regularly sued by prisoners for allegations of failure to protect, and he states that the risk of long hair unnecessarily exposes the TDCJ to increased liability. *Id.* Finally, Mr. Eason points out that long hair would make

---

[9] This case is distinguished from the *Garner* case for that reason. In *Garner,* the Plaintiff's right, under RLUIPA, to wear of a quarter-inch beard was upheld by the Fifth Circuit. *Garner*, *supra.* Unlike the Plaintiff in *Garner,* Plaintiffs here seek to wear a kouplock of unlimited length on the back of the head, and have never suggested that they would be satisfied with quarter-inch kouplock.

identification of prisoners both in and outside of prison (in the event of an escape), more difficult.  *Id.*

Defendants also offer the testimony of Jennifer Gonzalez, Assistant Budget Director of the TDCJ Business and Finance Division.  (Appx 450-52).  Using "54" as the number of active McConnell Unit NA faith adherents, Ms. Gonzalez calculated that the annual cost for searching the hair of those 54 inmates would be approximately $7,753.15.  *Id.* at 450.

Although RLUIPA claims must be evaluated on a case-by-case basis, the Fifth Circuit has effectively foreclosed Plaintiff's RLUIPA claim regarding the grooming policy and their desire to wear long hair.  In *Longoria v. Dretke,* 507 F.3d 898 (5th Cir. 2007), the plaintiff, an inmate of Mexican and Native American descent, requested permission to grow his hair because the Great Spirit instructed him to do so. *Id.*  He advised prison officials that he would not cut his hair due to his religious beliefs, but officials told him he would not be exempt from the grooming policy.  He sued under RLUIPA and the district court dismissed the lawsuit as frivolous.  On appeal, the Fifth Circuit referenced its decision in *Diaz v. Collins,* 114 F.3d 69 (1997), that was decided under RFRA, and held: "Because the test under RLUIPA is sufficiently the same as that previously imposed under RFRA, we hold TDCJ-ID did not violate Longoria's rights by, pursuant to the grooming policy, denying him permission to grow his hair."  *Longoria,* 507 F.3d at 901.

In *Thunderhorse v. Pierce,* 364 Fed. Appx. 141 (5th Cir. 2010) (unpublished), the Fifth Circuit again relied on *Diaz and* noted:

> … that prisoners may hide weapons and other contraband in their hair. 114 F.3d at 73.   In addition, requiring short hair makes it more difficult for an escaped prisoner to alter his appearance from photographs that the TDCJ periodically takes of each inmate.  *Id.*  In light of these concerns, we held that "the security interest at stake cannot meaningfully be achieved appropriately by any different or lesser means than hair length standards.  *Id.*

*Thunderhorse,* 364 Fed. Appx. at *4.  Thus, the Fifth Circuit has determined that, even if the grooming policy interferes with a prisoner's right to practice his religion, the policy is the least restrictive means of furthering the TDCJ's compelling interest in security and managing costs.  The evidence presented in this case falls squarely within that reasoning, and Plaintiffs fail to establish that a genuine issue of a material fact exists.

Similarly, Plaintiffs' desire to wear a kouplock raises the same security concerns and costs as does their request to grow long hair.  The Fifth Circuit has held that RLUIPA "is not meant to elevate accommodation of religious observances over the institutional need … to control costs," and "controlling costs … involves compelling governmental interests."  *DeMoss v. Crain,* 636 F.3d 145, 154 (5th Cir. 2011) (quoting *Baranowski v. Hart,* 486 F.3d 112, 125 (5th Cir. 2007).  The TDCJ is not obligated to spend large amounts of money in order for Plaintiffs to wear long hair or a kouplock.  The uncontroverted summary judgment evidence establishes that allowing long hair or a kouplock could increase the danger to correctional officers during a search as they must enter the "strike zone," increase the risk of serious injury to NA offenders if attacked by another inmate, and lead to increased liability exposure to the TDCJ.  The grooming policy is the least restrictive means of promoting the TDCJ's compelling interests in security and costs.

*(d)*     *Medicine bags.*

For the same reasons Plaintiffs' RLUIPA claims must fail in regards to hair length and kouplocks, so must their challenge to the TDCJ policy that limits the wearing of their medicine bags: the potential security risks and costs are too great.

In 2009, TDCJ Chaplaincy Department Policy 05.02 included medicine bags as approved devotional items for offender possession.  (Appx 410-413, at 412).  However, that same policy expressly limited an NA offender's wearing of the bag "to the offender's cell/dorm area or immediate bunk area in a dorm setting, and at all religious services." *Id.* at 412.  In July 2012, the issue of medicine bags was moved to Chaplaincy Department Policy 05.01, but the provisions concerning the wearing of the medicine bags remained virtually the same.  (Appx 343-356).  Specifically, as to "Medicine Bags or Pouches," Policy 05.01, Procedures II.D.1. provides: "[w]earing the bag or pouch is limited to the offender's cell or immediate bunk area in a dorm setting, and at religious services."  (Appx at 346).

The TDCJ's security and cost concerns are magnified in the context of NA medicine bags.  This is because under the TDCJ devotional items policy, correctional officers are instructed to ***not touch*** the medicine bag or its contents.  (Appx 412).  Only visual inspection is permitted.  *Id.*  If NA practitioners were allowed to wear their medicine bags at all times, correctional officers would have to perform visual inspections of the bag upon every ingress and egress which would unarguably take additional time and hinder the scheduled operations of the prison.  Moreover, the very fact that the medicine bag can and does contain items, raises numerous contraband and smuggling

concerns.  Finally, it is inevitable that other offenders would attempt to grab or take a medicine bag from an NA adherent if worn throughout the day.  The medicine bag could also result in choking of an inmate.  The medicine bag policy is justified by security and resource concerns, and there is no reason to question the TDCJ's position that it is using the least restrictive means of furthering those compelling state interests.

### C. First Amendment claims against Morris in his individual capacity.

Plaintiffs are suing Mr. Morris in his individual capacity for monetary damages for alleged violations of their First Amendment rights.  Plaintiffs argue that Mr. Morris arrived at the McConnell Unit in May 2009, and at that time, pipe ceremonies were in fact authorized by TDCJ policy.  Plaintiffs contend that Mr. Morris failed to perform the very responsibilities he was hired by the TDCJ to perform, effectively denying plaintiffs their right to practice their religion as provided by the First Amendment. Defendant Morris seeks to dismiss plaintiffs' claims on the grounds that they have failed to raise a constitutional violation and argues that his actions were objectively reasonable, such that he is entitled to qualified immunity.

The defense of qualified immunity protects government officials performing discretionary functions from "liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known." *Harlow v. Fitzgerald*,  457 U.S. 800, 818 (1982); *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 409 (5th Cir. 2009). Government employees are presumptively entitled to the defense of qualified immunity. Once asserted, the burden shifts to a plaintiff to demonstrate that qualified immunity does not bar their recovery. *Salas v. Carpenter*, 980 F.2d 299, 305

(5th Cir. 1992). A two-step process has traditionally been employed in evaluating the defense of qualified immunity. *Saucier v. Katz*, 533 U.S. 194 (2001). Under the traditional approach, a court must first consider whether "the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201.  Second, if the plaintiff has satisfied the first step, courts are required to decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id. See also Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011). "To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citations omitted). The Fifth Circuit has specified that the issue for a court's consideration with respect to the second step is whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.  *Short v. West*, 662 F.3d 320, 325 (5th Cir. 2011) (citations omitted).  Conclusory allegations of wrong-doing fail to satisfy both the first and second requirement. *Geter v. Fortenberry*, 849 F.2d 1550, 1553 (5th Cir. 1988). More recently, the Supreme Court held that a case may be dismissed based on either step in the qualified immunity analysis: "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in the light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Short v. West*, 662 F.3d 320, 325 (5th Cir. 2011).

Defendant Morris first argues that Plaintiffs have not shown a constitutional violation under the Free Exercise Clause. The Supreme Court has made it clear that prisoners must be provided "reasonable opportunities" to exercise their religious beliefs. *Cruz v. Beto*, 405 U.S. 319 (1972) (*per curiam*). The Court has recognized, however, that limits may be placed on the religious rights that must be afforded to inmates. In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court held "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," and "[w]hen a prison regulation impinges upon the inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id*. at 89. Four factors that should be considered in determining the reasonableness of a regulation: (1) there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) are there alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of alternatives is evidence of the reasonableness of a prison regulation. *Id*. 89-91. Shortly after the *Turner* decision, the Supreme Court applied the test to uphold a prison policy that prevented inmates from attending Islamic prayer services. *O'Lone v. Estate of Shabazz*, 482 U.S. 382 (1987). The Fifth Circuit subsequently added that the Supreme Court neither held any single factor to be dispositive, nor did it require all four factors to be met. *Scott v. Mississippi Dept. of Corrections*, 961 F.2d 77, 80 (5th Cir. 1992). The first factor has been held to be controlling in these cases, and the other factors merely provided help in determining

whether the connection was logical. *Id.* at 81. More recently, the Fifth Circuit reaffirmed the basic idea that rationality is the controlling factor. *Mayfield*, 529 F.3d at 607.

Because Plaintiff has not shown a violation under RLUIPA, he likewise has not shown a violation of the Free Exercise Clause because RLUIPA imposes a more stringent standard than that of the First Amendment. *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008). Indeed, in *Freeman*, the Fifth Circuit expressed surprise that the inmate plaintiff brought religious claims under the First Amendment instead of RLUIPA because RLUIPA provides far greater challenges to prison regulations. 369 F.3d at 857 n.1. The Fifth Circuit has considered free exercise claims similar to Plaintiff's claims and have rejected them. *See Freeman*, 369 F.3d at 862-63 (rejecting challenge to policy regarding volunteers); *Baranowski*, 486 F.3d at 121-22 (rejecting challenge to volunteer policy); *Thunderhorse, supra* (rejecting requests for items to practice NA faith, observance of holy days and pipe ceremony). As shown under the discussion of RLUIPA, there are valid rational connections between the challenged policies and practices and compelling governmental interests. The first factor in the *Turner* analysis is satisfied with respect to all of Plaintiffs' claims.

Plaintiffs have failed to establish a constitutional violation in order to satisfy the first step in the qualified immunity analysis.  Moreover, Plaintiffs have not offered any evidence to suggest that Defendant Morris engaged in any actions that were objectively unreasonable in light of clearly established law.  Defendant Morris is entitled to summary judgment based on qualified immunity to the extent Plaintiffs have sued him in his individual capacity for monetary damages.

**D.     Plaintiffs' motion for summary judgment.**

Plaintiffs filed a pleading entitled "Motion for Summary Judgment Default against Defendants."  (D.E. 129).  In this pleading, Plaintiffs summarize the September 8, 2011 meeting at which it was determined by TDCJ officials that the communal pipe would be smoked only by the NA chaplain or service leader.  (*See* Appx 111-114, *Chance* litigation meeting held on 09/08/11).  Plaintiffs then argue that Defendants were required to file their summary judgment motion on or before July 8, 2013, but failed to do so, and therefore, Plaintiffs should be granted summary judgment in their favor.  (D.E. 129 at 5).

Defendants' summary judgment motion was filed on July 8, 2013.  (*See* D.E. 120). In addition, Plaintiffs were provided with a copy of the Appendix to the summary judgment motion.  (D.E. 150).  There are no grounds for default, and Plaintiffs' motion (D.E. 129) is denied.

**VI.    Conclusion**

The summary judgment establishes that the TDCJ policies challenged by Plaintiffs, -- the Native American communal pipe policy, the requirement that all religious gatherings be conducted by a chaplain or approved volunteer, the grooming policy, and the devotional items policy, -- all impose substantial burdens on Plaintiffs' religious exercise.  However, the TDCJ has established with an abundance of uncontested and unchallenged evidence, that the policies are indeed the least restrictive means of furthering the TDCJ's compelling interests in maintain security and monitoring costs. Moreover, because the protections offered by the First Amendment are more limited than those extended under RLUIPA, Plaintiffs claims against Defendant Morris in his

individual capacity fail as a matter of law.   Accordingly, Defendants' motion for summary judgment (D.E. 129) is granted, Plaintiffs' motion (D.E. 125) is denied, and Plaintiffs' claims are dismissed with prejudice.   Any and all other pending motions are denied as moot.

ORDERED this 27th day of February, 2014.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE