United States District Court
Southern District of Texas
**ENTERED**
March 07, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| TEDDY NORRIS DAVIS, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:12-CV-166 |
| | § | |
| LORIE DAVIS, Director, TDCJ-CID, | § | |
| | § | |
| Defendant. | § | |

**OPINION AND ORDER ON REMAND DENYING DEFENDANT'S MOTION TO STRIKE, DENYING PLAINTIFFS' MOTION TO STRIKE, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' RLUIPA GROOMING POLICY CLAIM AND RECOMMENDING REMAND OF THE APPEAL FOR A TRIAL ON THE MERITS**

By judgment issued as mandate entered on July 6, 2016, the Fifth Circuit affirmed in part, and vacated and remanded in part, this Court's February 27, 2014 order granting Defendant's motion for summary judgment and denying Plaintiffs' cross-motion for summary judgment. (D.E. 191). The Fifth Circuit affirmed the dismissal of Plaintiffs' First Amendment claims as well as Plaintiffs' claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, regarding his medicine bag and pipe ceremonies, but retained and remanded Plaintiffs' RLUIPA claims challenging Defendant's grooming policy prohibiting long hair or alternatively, the growing of a kouplock. (D.E. 191 at p. 19). *See also Davis v. Davis,* 826 F.3d 258, 2016 WL 3269089 (5th Cir. 2016). The remand required examination of two issues: (1) whether Plaintiffs' summary judgment evidence setting forth the testimony of an expert, Mr. George Sullivan, exacted in an earlier trial before this Court on the identical issue of hair length,

kouplocks and prison security, could properly be considered on summary judgment in this proceeding; and (2) whether an exception to the grooming policy posed any risk to the safety and security of the prison population and staff due to Plaintiffs' individual security status.[1]  *Id.*

## I.   JURISDICTION.

The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Upon consent of the parties (D.E. 87, 102), this case was referred to the undersigned United States magistrate judge to conduct all further proceedings, including entry of final judgment.  (D.E. 107).  *See* 28 U.S.C. § 636(c).

## II.   PLAINTIFFS' CLAIMS AND PROCEDURAL BACKGROUND.

The procedural history of this case has been fully and accurately detailed in previous pleadings, as well as by the Fifth Circuit in its July 2016 opinion.  (*See* D.E. 191, pp. 2-4).  Briefly, Plaintiff Teddy Norris Davis and Plaintiff Robbie Dow Goodman are prisoners incarcerated in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID), and both are currently confined to the McConnell Unit in Beeville, Texas.

On May 21, 2012, Davis filed a *pro se* 42 U.S.C. § 1983 complaint alleging that certain TDCJ Defendants were burdening his right to practice his religious faith by

---

[1] In its opinion, the Fifth Circuit noted that Defendant had failed to object by separate motion to the admissibility of Mr. Sullivan's testimony, but had objected only in her summary judgment motion.  (D.E. 191, p. 10).  Defendant's objection to Sullivan's testimony is now before the Court in a separate motion (D.E. 200), as well as in the additional briefing of both parties.  (*See* D.E. 200, 210).  The prior trial referred to the testimony given before United States Magistrate Brian Owsley in *Odneal v. Pierce, et al.,* Civil Action No. 2:04-cv-00454.

implementing three TDCJ policies that prevented him from (1) smoking a prayer pipe during Native American pipe ceremonies, (2) wearing a religiously significant "medicine bag" other than within his cell and while walking to and from religious ceremonies, and (3) growing his hair long or alternatively, maintaining a kouplock, which is a continuously growing one inch square section of hair at the base of the skull.  (*See* D.E. 1).  Plaintiff Davis named as defendants the TDCJ-CID Director (then Rick Thaler, and now Lorie Davis) and Bill Pierce, the Director of the TDCJ Chaplaincy Department.

On June 21, 2012, a *Spears*[2] hearing was held with Plaintiff Davis, and he orally moved to add as defendants (1) Clint Morris, the Program Analyst for Designated Units, (2) Madeline Ortiz, the Director of Rehabilitative Programs, and (3) Shawna Mitchell, the McConnell Unit Chaplain.

On June 22, 2012, Robbie Goodman was granted leave to join as a plaintiff.  (D.E. 16).  Both Plaintiffs alleged that implementation of the challenged TDCJ policies caused them to suffer deprivations of their religious beliefs, and pointed out that if they disobeyed the TDCJ policies they were subject to disciplinary action, including loss of privileges and good time credits.

On February 11, 2013, Plaintiffs filed an Amended Complaint.  (D.E. 88).  Thereafter, following Plaintiffs' consent to proceed before a magistrate judge, Plaintiffs voluntarily dismissed all of their claims except their three RLUIPA challenges which sought injunctive and declaratory relief against TDCJ-CID Director Rick Thaler in his

---

[2] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

official capacity, and their First Amendment claim against Clint Morris, a TDCJ Program Analyst.   After Thaler retired, William Stephens was substituted as the TDCJ-CID Director Defendant, and on May 5, 2016, the new TDCJ-CID Director, Lorie Davis, was appointed and substituted as a defendant in this action.

On February 27, 2014, this Court issued its Opinion and Order on Cross-Motions for Summary Judgment and Final Judgment.  (D.E. 158, 159).  The undersigned found that Plaintiffs are sincere practitioners of the Native American faith and that the policies complained of constituted a substantial burden on their religious exercise.   The undersigned further found that Defendant had demonstrated that the challenged prison regulations were the least restrictive means of furthering compelling governmental interests, in particular, the prison's interest in security, such that Plaintiffs' request to modify those policies be denied.

Plaintiffs appealed (D.E. 161), and by Order issued as mandate entered on July 6, 2016, the Fifth Circuit affirmed the dismissal of Plaintiffs' First Amendment claim and RLUIPA claims regarding the tobacco policy and medicine bag policy.  (D.E. 191).  The Fifth Circuit remanded for further briefing on Plaintiffs' challenge to the TDCJ-CID grooming policy and the issue of whether or not this Court should have considered the testimony of Mr. Sullivan and further to examine the individual security risk(s) posted by each Plaintiff.

On July 12, 2016, this Court ordered the parties to submit additional briefing following the Fifth Circuit's remand.  (D.E. 192).

Defendants filed a motion for clarification of appeal (D.E. 161), and on August 8, 2016, the Fifth Circuit clarified that only additional briefing was necessary and that there was no need for a trial.  (D.E. 198).

On August 10, 2016, Defendant filed a motion to strike the testimony of Mr. George Sullivan, (D.E. 200), and on September 28, 2016, Plaintiffs filed a motion to strike some of the exhibits contained in Defendant's additional briefing. (D.E. 210).  The parties filed numerous replies and responses to replies, and all have been considered in connection with the remand order. (D.E. 200-230).

## III.    SUMMARY JUDGMENT STANDARD.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P.  56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion.  *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence, or evaluate the credibility of witnesses.  *Id.*  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the

matters stated therein."  FED. R. CIV. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions).    Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings.  FED. R. CIV. P. 56(e); *Anderson*, 477 U.S. at 248.  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted."  *Caboni*, 278 F.3d at 451.  "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed."  *Anderson*, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact.  "[T]he substantive law will identify which facts are material.  Only disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## IV.   DISCUSSION.

### A.    Issue One: Testimony of George Sullivan.

In their cross-motion for summary judgment/summary judgment response (D.E. 129), Plaintiffs relied on the prior testimony and expert report of a retired prison official, George Sullivan, elicited during a trial of another case held before Magistrate Judge Brian Owsley, to support their argument that kouplocks do not pose risks to prison security sufficient to warrant their prohibition by TDCJ-CID's grooming policy.  (D.E. 143).   Without squarely addressing the admissibility of Plaintiffs' proposed expert testimony, this Court granted summary judgment in favor of Defendant, thus effectively ignoring Sullivan's proffered testimony. (D.E. 158).   The Fifth Circuit vacated and remanded on Plaintiffs' claim that TDCJ's grooming policy violates their right under RLUIPA to wear a kouplock consistent with their Native American faith, but instructed this Court to make a specific finding as to the admissibility of Sullivan's testimony. (D.E. 191).

Defendant Davis moves to strike Plaintiffs' proffered expert testimony arguing that the testimony cannot and could not have properly been considered because it was offered in an improper manner and form under Federal Rules of Civil Procedure 26(a)(2) and 56(c), and is unreliable under Federal Rule of Evidence (FRE) 702 and *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1987).  (*See* D.E. 200, D.E. 205, pp. 18-

28).  Sullivan's testimony is found at the following entries in this case:  D.E. 143-1, pp.

14-17, 20-25, 27-28, 30; D.E. 143-2, pp. 1, 4, 12, 18; D.E. 143-3, p. 14, 17-18, and 24.

**(1)    Standard of Review.**

Trial courts have wide latitude when ruling on the admissibility of expert

testimony.  *Hammond v. Coleman Co.,* 209 F.3d 718 (5th Cir. 2000).  Because trial courts

serve as gatekeepers, their exclusion of expert testimony is reviewed only for an abuse of

discretion.  *See, e.g. Boyd v. State Farm Ins. Cos.,* 158 F.3d 326, 331 (5th Cir. 1998)

("With respect to expert testimony … its ruling must be sustained unless manifestly

erroneous.").  Here, no specific ruling was made on the admissibility of Sullivan's report

and so the Court addresses the issue for the first time.

**(2)    Defendant's Motion to Strike**.

Defendant argues that Plaintiffs' summary judgment evidence setting forth the

prior testimony of George Sullivan could not properly be considered as expert testimony

on summary judgment because Plaintiffs retyped or merely referenced portions of Mr.

Sullivan's expert report, deposition, and prior trial testimony from a previous trial held in

the Corpus Christi Division, *Odneal v. Pierce, et al.,* Civil Action No. 2:04-cv-00454,

thus failing to satisfy either the procedural requirements of FED. R. CIV. P. Rules 26(a)(2)

and 56(c)(1)(A) or the reliability requirements of *Daubert* and FED. R. EVID. 702.

**(a)    FED. R. CIV. P. 26.**

As inmates proceeding *pro se*, Plaintiffs are excused from the duty to participate in

initial disclosures.  *See* FED. R. CIV. P. 26(a)(1)(B)(iv), excusing from initial disclosures

"an action brought without an attorney by a person in the custody of the United States,

state, or a state sub-division."  Although excused from initial disclosures, *pro se* plaintiffs are not excused from complying with FED. R. CIV. P. 26(a)(2)(D)(ii) in regards to disclosing expert witnesses.  That rule provides:

> (D)  *Time to Disclose Expert Testimony.*  ... absent a stipulation or a court order, the disclosures must be made:
>
> (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject identified by another party under Rule 26(a)(2)(B) or (C), within thirty days after other party's disclosure.

FED. R. CIV. P. 26(a)(2)(D)(ii).

In this case, on September 13, 2012, Defendant disclosed her expert witnesses in her Initial Disclosures, along with a statement of proposed testimony.  (D.E. 36).  (*See also* D.E. 206-11, pp. 1-10).  Defendant argues that Plaintiffs were thus required to disclose the expert testimony of Mr. Sullivan that they intended to use to rebut that testimony within thirty days, by October 13, 2012.  Plaintiffs first produced Sullivan's testimony on October 28, 2013, fifteen days past the Rule 26 deadline.  However, the mere fact that Plaintiffs' expert testimony was produced fifteen days late does not equate with a punishment of striking Plaintiffs' expert witness testimony.[3]  The essential inquiry is whether or not Defendant was prejudiced or harmed from this fifteen day delay.  Under Rule 37(c)(1), if a party fails to provide expert disclosures within the established deadlines, "the party is not allowed to use the information or witness to supply evidence

---

[3] Plaintiffs argue that they were unable to produce the expert report in full because they are indigent and were repeatedly denied requests for certified copies of Sullivan's reports such that they had to hand-write much of the information themselves.  (D.E. 217, p. 23).  Defendant does not refute this, and the docket indicates that Plaintiffs were denied copies of the transcripts at the Court's cost.

on a motion, at a hearing, or at trial, unless the failure *was substantially justified or is harmless*. (emphasis added).

In this case, Mr. Sullivan's testimony posed neither surprise nor harmful error to Defendant. Mr. Sullivan's testimony had been presented in an earlier Native American RLUIPA long-hair case to which the Director was a party. Moreover the fifteen day delay in Plaintiffs' producing the testimony caused no harm to Defendant, and Defendant did not file a motion to strike the expert testimony, but only raised the issue in her Reply to Plaintiffs' summary judgment motion. That is, Defendant had plenty of time to review the testimony offered by Plaintiffs and to prepare her objections thereto such that there was neither surprise nor harmful error. Defendant's Rule 26 as well as Rule 37(c)(1)(A) objections to Plaintiffs' expert testimony is overruled.

**(b)    Rule 56(c).**

The Fifth Circuit has held that a trial court may rely on certified transcripts of prior testimony in deciding a motion for summary judgment. *See, e.g., Tremont LLC v. Halliburton Energy Services, Inc.,* 696 F. Supp. 2d 741, n. 22 (S.D. Tex. 2010) (citing *Kelley v. Price-Macemon, Inc.,* 992 F.2d 1408, 1415 n. 12 (5th Cir. 1993). Defendant maintains that un-certified transcripts are inadmissible hearsay.

Generally, *pro se* plaintiffs are given leeway in the prosecution of their cases. The Fifth Circuit noted as such in the instant case, pointing to this Court's December 20, 2013 order which allowed Plaintiffs to "hand copy all documents sent to the Clerk." (D.E. 150). Defendant argues that this order should not be construed as giving permission to Plaintiffs to submit their hand-written materials as proper summary judgment evidence;

however, the Order has effectively already done as such.  Moreover, a comparison of Plaintiff's handwritten copies to the transcripts submitted in *Odneal* reveals that the copies are identical, and Defendant has failed to identify or point out any portions that incorrectly quote Mr. Sullivan or attempt to mislead the Court.  It is noted that the *Odneal* trial was against the TDCJ-CID Director, who had an opportunity during the *Odneal* trial to fully cross examine Mr. Sullivan, as well as to rebut Mr. Sullivan's testimony with testimony of the Director's own experts.  In this case, given the *in forma pauperis* status of the Plaintiffs, and the fact that the court may take judicial notice of the proceedings and the entire testimony of Mr. Sullivan,[4] fairness dictates that the testimony may be examined in connection with the summary judgment motion.

### (c)    Federal Rule of Evidence 702 and *Daubert*.

Defendant also challenges Mr. Sullivan's prior testimony and expert report as inadmissible under FED. R. CIV. P. 702.  When presented with expert testimony, the Court must determine at the onset if the proponent of the evidence has proven its admissibility by a preponderance of the evidence.  *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 592 n.10 (citing FED. R. EVID. 104(a) and *Bourjaily v. United States,* 483 U.S. 171, 175-76 (1987)).  To prove admissibility of an expert opinion on scientific, technical, or specialized knowledge, the proponent's evidence must satisfy

---

[4] A court may *sua sponte* take judicial notice of records in related cases, as long as it judicially notices only those adjudicative facts that cannot reasonably be questioned. *Moore v. Estelle*, 526 F.3d 690, 694 (5th Cir. 1976); *In re Base Holdings, LLC*, No. 3:13-CV-1584-D, 2014 WL 895403 at n. 5 (N.D. Tex. 2014). *See also In re Moity*, 320 Fed. App'x 244, 249 (5th Cir. 2009)("One court may take judicial notice of another court's judicial actions.")

the reliability standard.  FED. R. EVID. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

To determine reliability under FED. R. EVID. 702, courts consider whether the expert (1) has "sufficient facts or data" underlying the testimony; (2) applied "reliable principles and methods," and (3) reliably applied the principles and methods to the facts of the case.  Federal courts applying Rule 702 should look closely and directly at evidence, and consider a wide range of factors bearing on reliability—courts are gate-keepers and must access the validity and reliability of scientific evidence.  *Daubert,* 509 U.S. at 590-92.

*Kumho* clarified *Daubert's* ambit as including specialized knowledge (e.g. prison security).  509 U.S. at 590-91.  The *Kumho* court emphasized that courts should not only consider the specific factors identified in *Daubert* where they reasonably measure the reliability of expert testimony, but also, given the particular nature and facts of the case, should consider other factors weighing on whether the expert's conjectures have "a reliable basis in the knowledge and experience of the relevant discipline."  *Id.* at 591.

Merely qualifying an expert does not pave the way for whatever the expert might want to say about the case.  *Daubert,* 590 U.S. at 595-96.  The expert must reach conclusions that are consistent with those reached by others applying similar analyses to similar facts.  *Id.*  Disparity is a red flag—it suggests that something about the method or manner has gone wrong and that reliability has not been met.

Other "red flags … caution against certifying an expert [that] include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack

of testing, and subjectivity as well as whether "a purported expert's opinion was prepared solely for litigation." *Newell Rubbermaid, Inc. v. Raymond Corp.,* 675 F.3d 521, 527 (6th Cir. 2012). These red flags echo the Supreme Court's reasoning in *Joiner,* which expanded the reliability inquiry to include an assessment of the fit between an expert's specific opinions and the data, principles, and methods from which they are derived. *General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997) ("…[n]either *Daubert* [n]or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

Defendant has failed to offer any evidence to refute the reliability of Mr. Sullivan's expertise. Mr. Sullivan testified in the *Odneal* case that he has 55 years experience in state and federal corrections. ( *See Odneal,* Case No. 2:4-cv-454, D.E. 157, pp. 1-20). He worked as a warden and superintendent at the Oregon State Correctional Institution from 1969 through 1984. (*Odneal,* D.E. 157, p. 3). He served as a warden in a New Mexico prison until 1987, and thereafter, as Deputy Director in charge of statewide prison operations in Colorado until 1994. *Id.* at 3-4. While with the Oregon prison system, Sullivan implemented a Native American rights policy, including personal choice in hair length. *Id.* at 3. The Oregon prisons had no security incidents concerning hair length. *Id.* He has conducted audits of state and federal prisons, and has served as a professional corrections consultant and expert witness, having served on the accreditation special task force as well as a special committee concerning protective custody. *Id.* at p. 7. The uncontested summary judgment evidence establishes that Mr. Sullivan is an expert in prison operations and safety.

Defendant argues that she was denied the opportunity to review properly Mr. Sullivan's prior trial testimony because Plaintiffs provided only their hand-copied and selected excerpts of Sullivan's testimony rather than a complete certified trial transcript plus any written reports of Mr. Sullivan.   This argument is without merit however because, as mentioned earlier, the Director had access to Mr. Sullivan's testimony in *Odneal* and in other trials held against the Director in this court.[5]

Moreover, Plaintiff's contention that she did not have access to Mr. Sullivan's report and findings is simply not true.  In *Odneal v. Dretke,* 435 F. Supp. 2d 608 (S.D. Tex., Jun. 21, 2006) (C.A. No. 2:04-454), this Court dismissed Odneal's claims regarding wearing a medicine bag, growing long hair, and engaging in pipe ceremonies finding the TDCJ policies prohibiting such practices were reasonably related to the TDCJ's legitimate interest in security.   On appeal, the Fifth Circuit affirmed the pipe ceremony claim but remanded the hair and medicine bag claims for further development.   *Odneal v. Pierce,* 324 Fed. Appx. 297 (5th Cir. 2009).

On remand, Odneal was appointed counsel, and he abandoned his medicine bag claim, retaining only his long hair/kouplock claims.   At summary judgment, the TDCJ produced evidence that kouplocks could present security issues concerning inmates' identification and provide a hiding place for secreting contraband.   Odneal countered this evidence with the testimony of Mr. Sullivan, and summary judgment was denied.   *See Odneal v. Pierce,* 2010 WL 3359535 (S.D. Tex. 2010).   On December 13-14, 2010, a

---

[5] *Garner v. Morales, et al.,* Civil Action No. 2:06-cv-0218, affirmed, *Garner v. Kennedy,* 713 F.3d 237 (5th Cir. 2013).

bench trial was conducted before Magistrate Judge Owsley.  Before a ruling was entered, the TDCJ transferred Odneal to a prison in Minnesota where he would be permitted to grow his hair, and therefore, the kouplock issue became moot and remains undecided. (*See Odneal v. Pierce,* 2011 WL 2678940 (S.D. Tex. Jul. 7, 2011) (Case No. 2:04-454, D.E. 195, Order of Dismissal).  Although the *Odneal* case ultimately had no bearing on the merits of this case, it does show that Defendant had access to Mr. Sullivan's testimony and reports and that this Court had found his testimony and reports sufficient to raise a genuine issue of material fact for purposes of summary judgment.

On remand, the Court now finds that Defendant's motion to strike the testimony of George Sullivan (D.E. 200) should be denied and in all things is denied.  Defendant has had ample opportunity to review Sullivan's trial testimony and reports in certified forms and to assure herself that Plaintiffs' hand-written submissions, though not complete, are not misleading and adequately raise a fact issue on their own.  Thus, the testimony of Mr. Sullivan is admitted.

> **B.     Issue Two:   Evaluating the Marginal Interests of Each Plaintiff Under the RLUIPA.**

In its Order of Remand (D.E. 191), the Fifth Circuit noted remand was also appropriate because "…the district court did not appear to consider Plaintiffs' specific, individual status as low custody level inmates in relation to their theory that the grooming restrictions are unnecessary as applied to them." (D.E. 191, p. 16).

> **(1)     Section 3 of the RLUIPA.**

Section 3 of the RLUIPA concerns institutionalized persons and states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1)  is in furtherance of a compelling governmental interest; and
>
> (2)   is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  The Act broadly defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000cc-5(7)(A).

RLUIPA, which provides a private cause of action, *id.,* § 2000cc-2(a), implements a burden-shifting framework.  *Chance v. Tex. Dep't of Crim. Justice.*  The plaintiff's initial burden is two-fold: he or she must show that (1) the relevant religious exercise is "grounded in a sincerely held religious belief" and (2) the government's action or policy "substantially burden[s] that exercise" by, for example forcing the plaintiff "to 'engage in conduct that seriously violates [his or her] religious beliefs.'"  *Holt v. Hobbs,* ____ U.S. ____, ____, 135 S. Ct. 853, 862 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.,* ____ U.S.____, 134 S. Ct. 2751, 2775 (2014)).  If the plaintiff carries this burden, the government bears the burden of proof to show that its action or policy (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that interest.  42 U.S.C. § 2000cc-1(a); *Holt,* 135 S. Ct. at 863.

Despite RLUIPA's express purpose of protecting the religious observances of individualized persons, the statute does not give courts carte blanche to second-guess the

reasoned judgments of prison officials.  Indeed, while Congress enacted the RLUIPA to address the many "frivolous or arbitrary" barriers impeding institutionalized persons' religious exercise, it nevertheless anticipated that courts entertaining RLUIPA challenges "would accord 'due deference to the experience and expertise of prison and jail administrators.'"  *Cutter v. Wilkinson,* 544 U.S.709, 716-17 (2005) (*quoting* 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sens. Hatch and Kennedy on the RLUIPA)).  The Supreme Court has cautioned that "[w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety," and "an accommodation must be measured so that it does not override other significant interests."  *Id.* at 722.  The Court further instructed:

> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns.  While the Act adopts a "compelling governmental interest" standard, context matters in the application of that standard. Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions.  They anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

*Id.* at 722-23 (internal quotation marks and citations omitted).  This deference is not, however, unlimited, and "policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the Act's requirements." *Rich v. Secretary, Florida Dep't of Corrections,* 716 F.3d 525, 533 (11th Cir. 2013) (internal quotation marks omitted).

(2)   *Holt v. Hobbs*.

In *Holt v. Hobbs,* 135 S. Ct. 853 (2015), the Supreme Court considered a RLUIPA challenge to the Arkansas Department of Corrections' (ADOC) no-beard policy. The policy prohibited inmates from wearing facial hair other than a "neatly trimmed mustache." *Id.* at 860. The policy made no religious exceptions, but did allow inmates with diagnosed dermatological conditions to wear a ¼-inch beard. *Id.* In accordance with his Muslim faith, Gregory Holt sought permission to grow a ½-inch beard. *Id.* at 859, 861. The ADOC denied Holt's request and he filed suit under RLUIPA. *Id.* at 861. Following an evidentiary hearing, the district court dismissed Holt's complaint for failure to state a claim, and the Eighth Circuit affirmed. *Id.* The Supreme Court reversed, holding that ADOC's grooming policy violated RLUIPA *as applied to Holt.* *Id.* at 867 (emphasis added).

The Court reasoned that the ADOC's stated justification for the policy, preventing the flow of contraband, would not be seriously compromised by permitting Holt to grow a ½-inch beard. *Id.* at 863. In reaching this conclusion, the Supreme Court noted that permitting a religious accommodation to a grooming policy may still allow prison officials to maintain security because RLUIPA allows an institution "to withdraw an accommodation if the claimant abuses the exemption in a manner that undermines the prison's compelling interests." *Id.* at 867.

A panel of the Fifth Circuit applied *Holt* to affirm a decision out of the Eastern District of Texas granting a Muslim inmate the right to grow a four-inch beard and wear his kufi throughout TDCJ's facilities in *Ali v. Stephens,* 2016 WL 1741573 (E.D. Tex.

May, 2, 2016).  In affirming the bench trial decision, the Fifth Circuit reviewed the district court's findings as to the TDCJ grooming policy and evaluated the evidence supporting the TDCJ's concerns over preventing the transfer of contraband, facilitating inmate identification, controlling costs, and ensuring orderly program administration, all concerns that were raised in the instant litigation with Davis and Goodman.  In fact, George Sullivan testified as an expert in the *Ali* bench trial that self-searches and visual inspections of longer beards are effective methods for revealing contraband.  *Ali,* 2016 WL 1741573, at *8.  After examining the specific exemption requested (a four-inch beard), the Fifth Circuit found that the TDCJ's ban on the wearing of such a beard as to Ali was not the least restrictive means of furthering these interests.  It was noted that Ali is a "trusty" inmate which is the lowest security level classification, and that he lives in a dormitory outside of the Michael Unit's fence line.  *Id.*

In light of *Holt,* TDCJ's asserted compelling interests must be examined in light of the particular characteristics of each Plaintiff, including the Plaintiff's security risk status and the particular risks of the specific exemption requested.  *Holt,* 135 S. Ct. at 863.

### (3)  Plaintiffs' Security Risk Status.

The Fifth Circuit has ordered the Court to evaluate the grooming policy as to each Plaintiff, including in the context of each Plaintiff's particular security classification. (D.E. 191, p. 19).  Plaintiffs have presented their security classification.  (D.E  217). Defendant objects to this evidence arguing that Plaintiffs are raising their low risk "allegation" for the first time in response to Defendant's summary judgment motion such that it is not before the Court properly and should not be considered.  (D.E. 205, pp. 16-

19).  Defendant's argument is without merit.  Plaintiffs were ordered by the Fifth Circuit and also by this Court in its July 12, 2016 order for additional briefing (D.E. 192) to provide evidence regarding their security status, and they filed their briefing on November 21, 2016.  (D.E. 217).  Moreover, the security status of Plaintiffs is a *fact issue* in which their RLUIPA claim is evaluated; it is not a separate claim as suggested by Defendant.  Plaintiffs' motion to strike (D.E. 210) is denied for the same reasons.

Warden Barber explains that, in evaluating an inmate's custody level,[6] several factors are considered including (1) an offender's current institutional behavior, (2) his current offense and (3) his current sentence length.  (D.E. 206-3, Barber Aff't, p. 5).  Disciplinary convictions may negatively affect an inmate's custody designation.  *Id.*  Similarly, offenders who comply with the rules and progress without receiving a disciplinary case may be assigned a less restrictive custody level.  *Id.*

    **(a)**    **Plaintiff Davis.**

            ***Current offense and sentence length***.

Plaintiff Davis is serving a 50-year sentence for indecency with a child making sexual contact.  (D.E. 206-1, p. 2).  He is currently eligible to be reviewed by the Texas

---

[6] According to the TDCJ-CID Prisoner Handbook, upon entering the TDCJ, a prisoner is assigned both a ***custody*** classification (G1-G5, and administrative segregation), and a ***line class*** designation.  See www.tdcj.state.tx.us/documents/Offender_Orientation_Handbook_English.pdf, p. 7-8.  The custody classification indicates where and with whom the inmate can live, how much supervision he will need, and what job he will be assigned to, if any, and it is determined by a classification committee.  *Id.* at 7.  The prisoner's line class is his time-earning status, designated as L1-3 through S1-3, indicating the rate at which he can earn good time credits.  *Offender Handbook,* p. 7.  All inmates are assigned Line Class 1 (L1) when they first arrive.  *Id.*, p. 8.  Inmates can work their way into a higher time earning status or be placed into a lower time earning status, dependent upon their behavior.  *Id*.

Board of Pardons and Paroles on July 23, 2017 for release on discretionary mandatory supervision.  *Id.*

### Institutional behavior.

Since his arrival in the TDCJ on December 17, 1997, Plaintiff has received sixteen disciplinary cases, thus averaging less than one disciplinary case per year.  (D.E. 206-3, p. 3).   Of those sixteen cases, fourteen were classified as minor offenses, one was classified as major/minor, and one was classified as major.  *Id.*   In the major case, Disciplinary Case No. 200002157, Plaintiff was charged on March 15, 2000, with fighting with another offender without a weapon, no serious injury.  (D.E. 206-7, pp. 57-67).  Plaintiff admitted that he got into a "misunderstanding" with the other inmate and began striking him with a closed fist about the face.  (D.E. 206-7, p. 59).   Officer Gonzales and another inmate intervened and stopped the fight.  *Id.*

A disciplinary hearing was held on March 22, 2000.  (D.E. 206-7, p. 57).  Based on the charging officer's report, Plaintiff was found guilty of the major offense of fighting.  *Id.*  As punishment, Plaintiff Davis lost 45 days recreation and commissary privileges, 100 days good conduct time, and a reduction in his line classification from S-3 to L-1.  *Id.*

The major/minor case was issued for refusing to obey an order on June 15, 2004 in Disciplinary Case No.20040293107.  (D.E. 206-7, pp. 37-38).  A hearing was held on June 18, 2004, and Plaintiff admitted he was guilty.  *Id.* at 37.  As punishment, Plaintiff lost recreation and commissary privileges, and his contact visits were suspended.  *Id.* at 38.

Since filing this lawsuit in May 2012, Plaintiff has been charged with two minor disciplinary offenses.  In Disciplinary Case No. 20150300406, Plaintiff was charged with being out of place.  (D.E. 206-6, pp. 7-8)  More specifically, he was in the restroom area on June 19, 2015, when he had no authorization to be there.  *Id.*  Plaintiff pled guilty and as punishment received 10 days cell restriction.  *Id.* at 7.

On June 10, 2016, Plaintiff was charged with being out of place.  (D.E. 206-6, pp. 3-4.  Plaintiff was at the 18/19 gate going to church, but he had no authorization to be doing so.  *Id.*  As punishment, he received a verbal reprimand.  *Id.*

**(b)    Plaintiff Goodman.**

***Current offense and sentence length****.*

Plaintiff Goodman is currently serving two 25-year sentences for aggravated sexual assault of a child.  (D.E. 206-2, p. 2)  His projected release date is March 21, 2021.  *Id.*  His custody level is G2, and his line class is S3.  (D.E. 206-8).

In the past nineteen years, from September 3, 1996 through January 31, 2016, Plaintiff Goodman has received twenty-two disciplinary convictions.  (D.E. 206-4, pp. 3-4).[7]  Of those cases, three were major.  *Id.*  In the first major case, Disciplinary Case No. 20020266604, Plaintiff was charged with assaulting another inmate with a roll of toilet paper.  (D.E. 206-10, p. 54).  No serious injuries were sustained.  *Id.*  Plaintiff pled guilty and as punishment received 45 days loss of commissary and recreation, 15 days solitary confinement, and a a reduction in his line class.  *Id.*

---

[7] There are actually 24 cases listed, but Warden Barber testifies that there were only 22 convictions, suggesting that two cases were dismissed.

Plaintiff's next major disciplinary case, Disciplinary Case No. 20080209241, occurred on April 5, 2008,  after a homemade pipe containing a leafy substance that tested to be marijuana was found in Plaintiff's his cell.  (D.E. 206-10, pp. 14-20). Plaintiff was found guilty.  *Id*. at 14.  The remainder of the report is not legible and therefore it in not known what punishment Plaintiff received.

Plaintiff's last major disciplinary case occurred on October 31, 2008, Disciplinary Case No. 20090061530, wherein Plaintiff was charged with possession of contraband/child pornography.  (D.E. 206-10, pp. 7-14).  According to Plaintiff, he had written the "story" by himself and it belonged to him.  Nevertheless, he was found guilty and as punishment received 45 days loss of commissary and recreation and 30 days loss of good time credits.  *Id.*, p. 7.

The uncontested evidence shows that Davis and Goodman both have a current custody classification of "G2."  (Davis, D.E. 206-3, p. 5; Goodman, D.E. 206-4, p. 6). Warden Barber points out that neither Plaintiff has earned G1 status and also concludes as to each: "He is not considered a low-risk offender."  (Davis, D.E. 206-3, p. 5; Goodman, 206-4, p. 6).  Warden Barber, however, fails to offer any evidence or authority that equates G2 status with ***not*** being low risk.  There are six levels in the custody classification:

> 1.    Administrative segregation.   This classification is for offenders who must be separated from the general population because they are dangerous, either to other offenders or staff, or they are in danger ***from*** other offenders.  Offenders who, according to the Security threat Group Management (STGMO), are members of security threat groups designated by TDCJ, may be given this custody level.  These offenders leave their cells, for the most part, only for showers and limited recreation.  Offenders

assigned to administrative segregation in expansion cellblocks shower in their cells.

2.  General Population Level 5 (G5) custody refers to offenders who have assaultive or aggressive disciplinary records.  G5 custody offenders must live in cells.  They may not work outside the security fence without direct, armed supervision.

3.  General Population Level 4 (G4) custody means the offender must live in a cell, with few exceptions, and may work outside the security fence under direct, armed supervision.

4.  General Population Level 3 (G3) refers to prison offenders who may live in dorms or cells inside the main building of the unit.  G3 offenders are ineligible to live in dorms outside the main building of a unit, inside the security fence.  G3 offenders will generally be assigned to field force and secure jobs inside the perimeter as designated by the warden. They may work outside the security fence under direct armed supervision.

5.  General Population Level 2 (G2) refers to offenders who may live in dorms or cells inside the security fence.  They may work outside the security fence under direct armed supervision.

6.  General Population Level 1 (G1) custody allows offenders to live in dorms outside the security fence.  Offenders living in trusty camps will be classified OT custody..  They may work outside the security fence with periodic unarmed supervision.

http://www.tdcj.state.tx.us/documents/Offender_Orientation_Handbook_English.

Pdf, p.6.

There are six custody levels, and Plaintiffs are the second lowest security risk group.  In *Ali v. Stephens,* the prisoner was indeed a trustee, but nowhere did the Fifth Circuit equate "low risk offender" with "G1"to the exclusion of other custody levels. Moreover, Defendant has failed to offer any evidence to suggest that G2 inmates, by this designation alone, are not "low risk" offenders within the TDCJ-CID.

Defendant has argued emphatically that Plaintiffs' disciplinary records demonstrate they are risky inmates who should not be given the chance to wear long hair or a kouplock, and she emphasizes in particular the fact that they received cases for being out of place or for possession of contraband, and that these type of cases lead to a breach in security.  (*See* D.E. 205, pp. 10-15).   The problem with Defendant's argument, however, is that it is the TDCJ-CID, not Plaintiff or the courts, who designated cases for contraband and being out of place as "minor."   While in in the context of the prison setting, any infraction potentially has an impact on security, and prison authorities have determined that some are major cases while some are minor. As reflected by their G2 custody level, Plaintiffs here did not participate in behavior that has prevented them from being G2.

Defendant points out that Plaintiff Goodman was in G4 custody "for about a year," following a major disciplinary infraction.  (D.E. 206-4, p. 6).   In 2008, Goodman did receive his two major cases for possession of contraband; however, based on good behavior, he was returned to G2.   Warden Barber testified that custody level is determined by several factors, including an offender's **current** institutional behavior. (D.E.205, p. 17).   Plaintiff Goodman is currently G2 with no disciplinary case within the last year.  (D.E. 206-4, pp. 3, 6).   This evidence could support a finding of low risk.

The specific exemption requested in this case by both Plaintiffs is to allow them to wear long hair or a kouplock.   In the district court, the TDCJ presented photographs of objects small enough in size to hypothetically be hidden in a kouplock, and evidence that inmates at other institutions hide contraband in various styles of short and long hair,

indicating that the grooming policy does further an interest in preventing the transfer of contraband.  (D.E. 191, p. 18).   But the Fifth Circuit found that the TDCJ did not demonstrate on the present record that a total ban on the growing of kouplocks, even as to low risk inmates such as Plaintiffs, is the least restrictive means of furthering that interest. Were Plaintiffs caught using their full head of hair or their kouplocks to smuggle contraband or for some other prohibited purpose, any accommodation could be withdrawn.  (D.E. 191, p. 18); *Holt,* 135 S. Ct. at 867; *see also Ali v. Stephens,* 2016 WL 1741573, at *14 ("TDCJ has not shown why it is impracticable to revoke kufi privileges for those inmates that resist such searches.").  In addition, the Fifth Circuit found that a fact question may be presented on this point based on George Sullivan's testimony that, in his experience, inmates are unlikely to hide contraband in their hair.  (D.E. 191, p. 18).

This Court previously found that the TDCJ's grooming policy provided the least restrictive means of allowing Plaintiff's to practice their Native American faith, even though it did place a substantial burden on such practice.  However, after *Hobbs* and its emphasis on personal accommodation, the Court looks again at Mr. Sullivan's testimony regarding security.

Mr. Sullivan testified:

> Through my personal experience as both a warden and as a deputy Director in charge of 20 prisons, over a period of 25 years, I readily attest that inmates … having long hair of personal choice length does not present any realistic, untoward security or prison operational problems.  Staff time and other costs incurred in managing such programs are routinely absorbed within the prison operation.  I have toured/audited 17 facilities of the U.S. bureau of prisons, all of which permit inmates to have beards and long hair, requiring only that they be kept clean and well groomed.  State prison systems which I have toured/audited that also permit inmates to wear

beards and long hair, requiring only that they be kept clean and well groomed, have also been seen by me to present to present no correctional/security problem …Presentations made by TDCJ of possibilities of inmates carrying contraband in their long hair … are possibilities, of course, but not probabilities; inmates have too many readily available other ways to transport contraband.  I have never heard or known of transporting contraband in long hair…actually happening, but such presentations seem to be convincing to non-corrections people.  TDCJ's refusal to permit inmates to wear long hair … has not prevented their inmates from carrying contraband or fashioning homemade weapons, i.e., "shanks."

(D.E. 143-1, pp. 15-16, Davis' typed submission of Sullivan's deposition testimony in *Odneal*).

Mr. Sullivan testified that he did not believe a kouplock would be grabbed by an inmate during a fight.  (D.E. 143-1, p. 16, Davis' typed submission of Sullivan's deposition testimony in *Odneal*).

On remand, after considering Mr. Sullivan's testimony in an identical case along with the contradictory summary judgment evidence presented by Defendant, the Court finds that Sullivan's testimony, as well as the contradictory evidence presented by all parties as to whether Plaintiffs are lower risk offenders, create factual issues that will require a trial.

## V.    CONCLUSION.

The summary judgment evidence establishes that the TDCJ grooming policy requiring short hair imposes a substantial burden on Plaintiffs' religious exercise. Plaintiffs' motion to strike (D.E. 210) and Defendant's motion to strike (D.E. 200) are denied.  Moreover, Plaintiffs have established that there is a fact issue as to whether TDCJ's grooming policy is the least restrictive means of maintaining institutional security

without added significant cost to TDCJ.  After revisiting this issue on remand, the court finds that summary judgment in favor of Defendants on the RLUIPA grooming claim should be withdrawn and denied, and recommends that the Fifth Circuit remand this case for trial.

The Clerk shall provide a copy of this order to all parties.  The Clerk shall further forward a copy of this order, as well as the entire supplemental Record on Appeal, to the Clerk for the United States Fifth Circuit Court of Appeals.

ORDERED this 7th day of March, 2017.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE