**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **ROBBIE DOW GOODMAN,** | § | |
| **WILLIAM CASEY, and** | § | |
| **RAYMOND COBB,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | **Civil Action No. 2:12-CV-166** |
| | § | |
| **LORIE DAVIS, Director, TDCJ-CID,** | § | |
| *Defendant.* | § | |

<u>**DEFENDANT'S PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**</u>

Plaintiffs Robbie Dow Goodman, William Casey, and Raymond Cobb, inmates currently confined in the Texas Department of Criminal Justice ("TDCJ"), filed this civil rights action pursuant to the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc, against Lorie Davis in her official capacity as the Director of TDCJ-Correctional Institutions Division. Plaintiffs challenge prison policies that prohibit them from growing hair in accordance with their religious beliefs. Specifically, Plaintiffs claim that their Native American faith requires that they grow their hair longer than the TDCJ grooming policy permits. TDCJ contends that their grooming policy is the least restrictive means of furthering their compelling government interests in safety and security, as well as operating within its budget and allocated limited resources.

On August 29 to August 31, 2018, a bench trial was conducted before Honorable Nelva Gonzales Ramos, District Judge for the United States District Court for the Southern District of Texas, Corpus Christi Division. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court announces and adopts the following final findings of fact and conclusions of law.

## FINDINGS OF FACT

1.      The McConnell Unit is a maximum security prison unit that can house over 2,750 inmates (also referred to as offenders). Transcript, Vol. 1 at 229–30.

2.      TDCJ operates 104 units, and houses approximately 144,000 incarcerated felons. Transcript, Vol. 1 at 232.

3.      TDCJ houses offenders that range from minimum custody, who are permitted to live and work outside the perimeter fence, to maximum custody and death-row offenders, who are isolated in their cells. Transcript, Vol. 2 at 11.

4.      TDCJ only houses offenders who have been convicted of a felony. People convicted of non-felony crimes are housed in county jails; not in TDCJ. Transcript, Vol. 2 at 11.

5.      In Fiscal Year 2016, the total offender population of TDCJ was 147,053. Of the total population, 134,545 were male and 12,508 were female. Of the total population, 81,882 offenders were incarcerated for "violent offenses." Transcript, Vol. 1 at 242.

6.      As of the time of trial, there are approximately 136,000 male offenders incarcerated in the TDCJ. There are approximately 12,000 female offenders incarcerated in the TDCJ. Transcript, Vol. 1 at 233.

7.      Annually, approximately 40,000 new offenders are received into TDCJ. Transcript, Vol. 2 at 14; Defendant's Exh. 10.

8.      In Fiscal Year 2016, thirty-four percent (34%) of the offenders received in TDCJ were convicted of a violent crime. Defendant's Exh. 10. Transcript, Vol. 2 at 17.

9.      TDCJ security staff do not carry firearms inside the buildings. Transcript, Vol. 2 at 191.

10.     Correctional officers do not have access to an offender's disciplinary or criminal history, or any information that they could use to predict whether offenders will act violently. Transcript, Vol. 3 at 29.

**Security Classifications**

11.     As of the time of trial, the three Plaintiffs were classified as G2 offenders.

12.     Offenders classified as G2 have access to areas of the prison to which offenders with higher security classifications do not have access. G2 offenders often move about the prison with no escort and no security supervision. Transcript, Vol. 2 at 19–20.

13.     Even G2 offenders commit disciplinary infractions in prison, such as smuggling contraband, fighting with other offenders, and using weapons. Transcript, Vol. 2 at 23; Transcript, Vol. 3 at 30.

14.     It is common for G2 offenders at the McConnell Unit to get into fights with each other, because G2 offenders make up the largest part of the population at the unit. Transcript, Vol. 2 at 194; Transcript, Vol. 3 at 26.

15.     At the McConnell Unit, G2 offenders are the population most frequently caught with contraband due to their access to items across the facility. Transcript, Vol. 2 at 195.

16.     G2 offenders are subjected to more frequent searches than higher custody offenders because of their movement and access throughout the facility. Transcript, Vol. 2 at 189–90.

17.     As of the time of trial, there were approximately 1,600 G2 offenders at the McConnell Unit, 400 G3 offenders, and 186 G5 offenders. Transcript, Vol. 2 at 190.

18.     Trustees, which are G1 offenders, live outside the perimeter fence of the prison facility. Transcript, Vol. 3 at 24–25.

19.     TDCJ recently experienced a situation in which a trustee killed another trustee. Transcript, Vol. 3 at 24.


**Identifying and Accounting for Offenders on the Unit**

20.     Identifying and accounting for offenders is one of the main priorities in correctional staff's daily schedule. Transcript, Vol. 2 at 199; Transcript, Vol. 3 at 55.

21.     Correctional officers identify offenders by comparing the offender's face to the photograph on his ID card, and by comparing the name on the ID card to the names listed on various rosters throughout the unit. Transcript, Vol. 3 at 55–56.

22.     Unlike officers in other state prisons systems such as Oregon, TDCJ correctional officers do not form familiarity with offenders due to volume and rotation. Officers are rotated in positions throughout the unit, and there are several thousand offenders at units like the McConnell Unit. Transcript, Vol. 3 at 56.

23.     Custody control is to identify offenders by their photographs, ensure they are in the place where they should be within the facility, and that every offender is accounted for throughout the day. This process is imperative in prison. Transcript, Vol. 3 at 55.

24.     Offenders have switched ID cards with each other in order to gain access to areas of the unit where they otherwise are not allowed, or to use another's ID card to purchase goods at the commissary. Transcript, Vol. 3 at 57.

25.     The McConnell Unit performs nine "counts" per day, meaning that the offenders are counted nine times throughout the unit. Transcript, Vol. 2 at 178–79.

26.     Two of the nine daily counts are "bed book counts," meaning that the officers check the printed roster list and make sure that the offenders on the list are each accounted for. Each offender must produce his ID card, and the officer matches the offender's face with the photograph on the ID card and checks the name and housing assignment listed on the roster. Transcript, Vol. 2 at 180.

27.     It is important for the unit to complete each of the nine counts within the allotted timeframe. Count can be delayed if there is a miscount, or if offenders do not have their ID cards. Transcript, Vol. 2 at 180.

28.     When one activity or task takes longer than the time allotted for it, it has a domino effect and can affect the schedule for the entire day. Transcript, Vol. 2 at 183; Transcript, Vol. 3 at 38, 58–59.

29.     It is common for the schedule to fall behind for various reasons, leaving officers to attempt to catch up by rushing through tasks or taking short-cuts. Transcript, Vol. 2 at 184; Transcript, Vol. 3 at 59.

30.     As of the time of trial, the McConnell Unit was operating at 82% of its staffing; eighteen percent (18%) of the correctional officer positions were unfilled. In the past, the McConnell Unit has faced even higher staffing shortages. Transcript, Vol. 2 at 181.

31.     Staffing shortages are a state-wide problem. Transcript, Vol. 2 at 113, 181.

32.     As of the time of trial, TDCJ had approximately 3,700 unfilled correctional officer positions. Transcript, Vol. 3 at 37–38.

33.     Being short-staffed puts a strain on the security and administration of a prison unit. If there are not enough staff, offender recreation time or other programming must be cut short or cancelled. Transcript, Vol. 2 at 182.

34.     Offenders can substantially alter their appearances by cutting their hair to avoid detection upon escape. Transcript, Vol. 3 at 59.

35.     Weakening TDCJ uniform grooming policies allows offenders to change their appearance more easily. Transcript, Vol. 3 at 59.

36.     Cutting or shaving off long head hair can substantially change the appearance of a person. Transcript, Vol. 3 at 59–60.

37.     Even in the absence of nefarious intent, offenders' ability to change their appearance by growing their hair or cutting or shaving their hair adds an obstacle for identifying offenders on a daily basis. Transcript, Vol. 3 at 59–60.

38.     A uniform grooming policy facilitates the quickest and most effective identification of offenders. Transcript, Vol. 3 at 59–60.

**Chaplaincy**

39.     At the time of trial, the total number of offenders in TDCJ custody identifying as Native American was approximately 5,617. Transcript, Vol. 2 at 133.

40.     Pursuant to the Chaplaincy policies, offenders whose faith designation is Native American are permitted to have the following devotional items: a feather, a shell, a medicine bag, seven sacred stones, a piece of bone, a tooth, an herbal mixture of sage, sweet grass and cedar, and a medicine wheel or medallion. Defendant's Exh. 2 at 75–76; Transcript, Vol. 2 at 138. Several items are also made available during group services for Native Americans, including a peace pipe, various instruments, and herbal mixtures of tobacco, sage, sweet grass, and cedar, resin from the bark of a tree, bayberry, sumac, ocia roots and lavender. Defendant's Exh. 2 at 75–76.

41.     TDCJ facilitates a monthly pipe service and smudging for Native American offenders at designated units, wherein a volunteer or chaplain smokes the pipe on behalf of the offenders and each offender is "smudged" with smoke (smoke is wafted on to each offender) from an herbal mixture. Defendant's Exh. 2 at 136–37.


**TDCJ's Grooming Policies**

42.     As described in the TDCJ Offender Orientation Handbook, TDCJ's Personal Cleanliness and Grooming policy (hereafter "the grooming policy" or "TDCJ's grooming policy") mandates that male offenders "shall keep their hair trimmed up the back of the neck and head. Hair shall be neatly cut. Hair shall be cut around the ears." Defendant's Exh. 1 at 25.

43.     TDCJ's grooming policy also mandates that female offenders "shall not have extreme hairstyles," but generally permits female offenders to wear their hair long. Transcript Vol. 1 at 261; Defendant's Exh. 1 at 25.

44.     There are no exceptions in TDCJ policy that allow male offenders to wear their hair long. Defendant's Exh. 1 at 25.

45.     TDCJ uniformed employees are also governed by a uniform grooming policy. TDCJ Personnel Directive 28 provides TDCJ's grooming standards for uniformed employees. Male officers' hair "shall not extend below the top of the uniform collar. Other methods to prevent the hair from extending below the top of the uniform collar, such as pinning or packing the hair, are unacceptable." Female officers' hair likewise "shall not extend below the bottom of the uniform collar. Hair shall be cut or pinned close to the sides, top, and back of the head to achieve this standard." Defendant's Exh. 6 at 3–4.

46.     If an offender refuses to cut his hair, he faces disciplinary action in the form of a minor case. The punishment for receiving a minor disciplinary case could include commissary restriction or recreation restriction, which means the offender cannot purchase goods from the commissary or may not participate in recreational activities for a determined number of days. Transcript, Vol. 1 at 166; Defendant's Exh. 3 at 2.

47.     Offenders are not assigned to Administrative Segregation, which is similar to solitary confinement, solely for refusal to comply with the grooming policy. Defendant's Exh. 3 at 3.

48.     Including Texas, there are eight state prison systems that prohibit long hair for male offenders, and all of these states are located in the warmer region of the country, southern coastal states. Transcript, Vol. 1 at 72; Vol. 3 at 118.

49.     TDCJ has a security interest and a rehabilitative interest in uniformity in the way offenders dress and wear their hair. Transcript, Vol. 1 at 261–62.

50.     TDCJ's different grooming policies for female and male offenders reflects TDCJ's elevated security concern with regard to male offender instances of possessing dangerous contraband. Transcript, Vol. 1 at 263.

**Plaintiffs**

51.     Plaintiff Robbie Dow Goodman, William Casey, and Raymond Cobb are inmates housed at the McConnell Unit of the TDCJ. Each of them were convicted of and are serving time for violent felonies. Defendant's Exhs. 42–44.

52.     Plaintiff Raymond Cobb is currently serving a life prison sentence for capital murder. Defendant's Exh. 43.

53.     As of the time of trial, Plaintiff Cobb was classified as a G2, S3 offender, which allows him more freedom of movement, and less restrictions than an offender with a higher classification. Transcript, Vol. 1 at 167.

54.     Plaintiff Cobb lives in dorm-style housing, which means he lives in a cubicle space in a large room with other offenders. He does not live in a cell, and he has unrestricted access to the shower and restroom area, day-room, and television area. Transcript, Vol. 1 at 167–68.

55.     Plaintiff Cobb's prison job assignment is as a janitor in the craft shop. Mr. Cobb also works in the craft shop as a woodworker. Transcript, Vol. 1 at 163.

56.     Plaintiff Cobb has received two disciplinary cases; one case for possession of contraband and another case for being found out of place. Transcript, Vol. 1 at 168–69

57.     Plaintiff Cobb claims to practice Native American spiritual beliefs. Among those beliefs is Plaintiff Cobb's belief that his hair is an extension of his soul and his spirit. Accordingly, Plaintiff Cobb believes that by cutting his hair, his spirituality and pride is defeated. He also believes that by cutting his hair, he risks rejection by his ancestors upon "crossing over" after death. Transcript, Vol. 1 at 165. If permitted to grow his hair long, Plaintiff Cobb desires to wear it in a braid because it signifies his strength. Transcript, Vol. 1 at 177.

58.     Plaintiff William Casey was received in TDCJ in 1994, and is serving sentences for multiple convictions of aggravated sexual assault of a child. Defendant's Exh. 44 at 2.

59.     As of the time of trial, Plaintiff Casey was classified as G2, S3. Like Plaintiff Cobb, Plaintiff Casey also lives in dorm-style housing. Transcript, Vol. 1 at 184.

60.     As of the date of trial, Plaintiff Casey was fifty-nine (59) years old. Transcript, Vol. 1 at 187.

61.     At trial, Plaintiff Casey was in a wheelchair. When he is at the McConnell Unit, he gets around by using crutches. Transcript, Vol. 1 at 187.

62.     As of the time of trial, Plaintiff Casey was assigned to work on the medical squad, which means he does limited work indoors due to medical limitations. Transcript, Vol. 1 at 190. Prior to being assigned to the medical squad, he worked for a time in the kitchen and in the garment factory. Transcript, Vol. 1 at 191.

63.     Plaintiff Casey believes that his long hair gives him strength and that it is a part of his soul. He believes that he needs to grow his hair long, because when a family member or friend dies, he must cut away a piece of his hair as part of his mourning ritual. Transcript, Vol. 1 at 183.

64.     As of the time of trial, Plaintiff Robbie Dow Goodman was classified as a G2 inmate. Like Plaintiffs Cobb and Casey, Goodman is assigned to live in dorm housing. Transcript, Vol. 1 at 198.

65.     Plaintiff Goodman is serving a sentence for multiple counts of aggravated sexual assault of a child. Defendant's Exh. 42 at 2.

66.     As of the time of trial, Plaintiff Goodman was fifty-three (53) years old. Defendant's Exh. 42.

67.     Plaintiff Goodman is currently medically unassigned, meaning he does not have a job inside the prison. Prior to being medically unassigned, he worked in the kitchen as a baker. Transcript, Vol. 1 at 195.

68.     Plaintiff Goodman has received eight disciplinary convictions for possession of contraband. Defendant's Exh. 20 at 2, 30, 34, 71, 91, 95, 100, 114, 122.

69.     Plaintiff Goodman received a disciplinary conviction for use or possession of a controlled substance in 2008. Defendant's Exh. 20 at 2 (possession of a homemade smoking pipe and marijuana).

70.     Plaintiff Goodman has received a major disciplinary conviction for use or possession of tattooing paraphernalia or an undocumented tattoo. Defendant's Exh. 20 at 65.

71.     Plaintiff Goodman received a disciplinary conviction for assaulting an officer by throwing an item at him. Defendant's Exh. 20 at 81–82.

72.     In the last ten years, Plaintiff Goodman received disciplinary cases for the following rule violations: being found out of place on two occasions, possession of contraband (namely, written pornography), possession of contraband (a metal antenna), possession of contraband (magazines, bleach, and string), possession of contraband (food stolen from the kitchen), and hanging a clothing line across his cell in violation of policy. Transcript, Vol. 1 at 198–201

73.     Plaintiff Goodman believes that his hair is a spiritual gift from the Creator and connects him to the Creator. He believes that without long hair, his ancestors will shun him when he dies. Transcript, Vol. 1 at 196–97.

74.     Native Americans are not the only offender-faith group that has an aspect of their faith that involves growing out their hair. Rastafarians, Sikhism, Jewish, Hasidic Jewish, Nazarite, and Christian are some of the other faith groups in TDCJ that have expressed a desire to grow their hair long. Transcript, Vol. 2 at 147–48, 162.

75.     TDCJ does not question any offender's sincerity in his or her religious beliefs. Transcript, Vol. 2 at 154.

76.     Allowing offenders to practice their religion can aid in rehabilitation in the prison context. Transcript, Vol. 2 at 157.


**Experts**

77.     The Court finds that TDCJ's expert, Mr. Jason Werner, is more credible than Plaintiff's expert, Ms. Joan Palmateer. Although Ms. Palmateer has over thirty years of experience working in

corrections, she has never worked in a prison system that is comparable to TDCJ in population, size, number of facilities, or budget. Transcript, Vol. 1 at 60–65. Ms. Palmateer spent her corrections career in the Oregon Department of Corrections. The entire Oregon prison system is approximately the population size of a single region within TDCJ; TDCJ has six regions. Transcript, Vol. 1 at 234. The region Mr. Werner oversees contains more inmates than the entire prison population of the State of Oregon. Transcript, Vol. 3 at 83–84. The Oregon Department of Corrections maintains fifteen prison facilities. Transcript, Vol. 1 at 145. As of 2015, Oregon housed a prison population of 14,538, while Texas housed 149,159 offenders. Plaintiff's Exh. 1. Oregon's budget afforded prison administrators approximately $44,000 annually for each offender, while Texas's budget allows for $22,000 annually per offender. Plaintiff's Exh. 1. Her corrections career with the Oregon Department of Corrections does not support her opinions about TDCJ's security and administration.

78.     Mr. Werner has significant experience working in TDCJ and the unique security concerns and prison administration challenges specific to Texas given its size, budget, and other characteristics.

79.     The Court finds TDCJ's expert, Mr. Ronald Angelone, to be a credible expert with regard to grooming policies in the prison context. Mr. Angelone served as the Director over several state prison systems, some that allowed offenders to grow their hair long and some that did not. He also has the unique experience of having changed the grooming policy in South Carolina from allowing offenders to grow long hair and changing to a uniform policy of short hair. Transcript, Vol. 2 at 217–18. Mr. Angelone experienced a prison escape wherein the offender shaved his long beard and long hair once he escaped the prison perimeter, effectively transforming his appearance. Transcript, Vol. 2 at 218. Mr. Angelone's knowledge, experience, education, and training qualify him as an expert in the areas in which he testified.

**The BOP and CDCR**

80.     The Federal Bureau of Prisons ("BOP") currently incarcerates more than 180,000 adults, of which 170,000 are male adults. Defendant's Exh. 27 at 1, 3.

81.     The California Department of Corrections and Rehabilitation ("CDCR") is responsible for fewer than 130,000 convicted felons, of which approximately 119,000 are male. Defendant's Exh. 30.

82.     The BOP and CDCR are the only two prison systems in the nation that are comparable to TDCJ in offender population. Transcript, Vol. 3 at 99.

83.     But there are innumerable differences between the BOP, the CDCR, and TDCJ.

84.     In 2018, the BOP was funded at $7.085 billion, or approximately $36,000 per offender per year. Defendant's Exh. 28.

85.     The TDCJ has a budget of approximately $3.5 billion.  Defendant's Exh. 46.

86.     The CDCR is responsible for less than 130,000 convicted felons, of which 119,000 are males. Defendant's Exh. 30.

87.     For fiscal year 2016–2017, the CDCR received $ 10.6 billion in funding. Defendant's Exh. 29 at 1.

88.     In 2015, California's average prison cost per inmate was $64,642, while Texas's average prison costs per inmate for that same year was $22,012. Plaintiff's Exh. 1 at 2–3.

89.     California spends approximately three times as much as Texas per inmate. Transcript, Vol. 3 at 82–83.

90.     These differences, and many others, affect the manners in which these prison systems operate.

**Religious Preferences and Long Hair**

91.     TDCJ recognizes 373 recognized faith preferences. Transcript, Vol. 2 at 129.

92.     TDCJ offenders are allowed to change their faith preferences once per year. Transcript, Vol. 2 at 140.

93.     In 2015, TDCJ amended the grooming policy to allow for a religious beard exemption, which allowed any offender to grow up to a four-inch beard by making a statement that their religious beliefs require a beard. The exemption was not limited to Muslim or any particular faith. Defendant's Exh. 1 at 24–25.

94.     Although there were less than 7,000 Muslim offenders in TDCJ at the time the religious beard policy was enacted, TDCJ received over 84,000 requests from offenders for religious beard exemptions in the first 18 months. Transcript, Vol. 2 at 165; Transcript, Vol. 3 at 340.

95.     As of February 14, 2017, there were 1,106 offenders who had requested to wear a beard for religious reasons the McConnell Unit. Defendant's Exh. 9 at 3.

96.     If TDCJ were to allow an exemption for religious hair on the head, it is reasonable to extrapolate, based on TDCJ's experience with the beard exemption, that offenders other than those with a Native American faith preference will request the exemption.


**Safety and Security**

97.     Maintaining safety and security is of paramount importance in prison. Transcript Vol. 1 at 125.

98.     Maintaining safety and security in prison involves a complex and dynamic structure. That structure is made up of tools and policies designed to further the goal of safety and security. Transcript Vol. 1 at 125.

99.     It is important in the prison context, to treat similarly situated offenders equally. Transcript Vol. 1 at 105. When TDCJ treats offenders differently, it leads to offender perceptions that an injustice has occurred, and the feeling that the prison is showing favoritism.

100.    It is important for prison policies to be consistent and uniformly applied to offenders. Transcript, Vol. 1 at 151.

101.    If TDCJ grants one religious group an exception from policy not afforded to other religious groups, it will lead to perceptions of unjust favoritism and jealousy. Transcript, Vol. 1 at 151.

102.    Offender perceptions of injustice and favoritism materially undermine TDCJ's ability to maintain safety and security. Transcript, Vol. 2 at 229.

103.    Maintaining safety and security requires treating similarly-situated offenders alike, including in the context of religious practices and grooming. Transcript, Vol. 2 at 229.

104.    TDCJ cannot grant Plaintiffs a unique religious accommodation and withhold the same accommodation to other offenders without materially undermining TDCJ's ability to maintain safety and security at the McConnell Unit, and system-wide. Transcript, Vol. 2 at 229.

105.    When creating prison policies regarding safety and security, prison officials do not write policies based on the behavior of the most well-behaved offenders; they do not write prison policies based on the behavior of the most egregious and violent offenders. Rather, prison officials consider the trends of the prison population and write policies that will keep everyone safe. Transcript, Vol. 2 at 104. There cannot be different sets of policies that apply to individual offenders. Transcript, Vol. 2 at 104.


**Contraband**

106.    Like many state prison systems, TDCJ faces challenges with combating contraband. Transcript, Vol. 3 at 61.

107.    Contraband is a prevalent problem in TDCJ. Contraband is a significant threat to the safety and secure operation of prisons. Transcript, Vol. 2 at 24–26.

108.    According to the TDCJ Offender Orientation Handbook, the term "contraband" refers to any item not permitted into the secured perimeter of a TDCJ unit, or in some cases, on TDCJ property. These items include, but are not limited to, alcohol beverages, controlled substances or any drug, firearms or deadly weapons, or any item brought onto TDCJ property with the intent to deliver to an offender, such as paper money, tobacco, lighter, matches, cell phones, pagers, laptop computers, cameras, digital recorders or any other type of electronic or wireless devices. Defendant's Exh. 1 at 98.

109.    Types of contraband include drugs, money, weapons, materials used for tattooing, along with nuisance contraband such as items permitted in prison but are missing the proper identification markings or property papers; or delinquent library books. Transcript Vol. 1 at 76–77.

110.    Prison officials are experienced and knowledgeable about the common places that offenders hide contraband, such as in body cavities, in their socks, and under the shoes. Because officials know these are common hiding places, they are likely to search these places for contraband. Transcript Vol. 1 at 78.

111.    Offenders are likely to hide contraband in places that correctional staff are less likely to search. Transcript Vol. 1 at 78.

112.    Many types of contraband can be hidden in long hair that is braided or in dreadlocks. Transcript Vol. 1 at 79.

113.    Sharpened items used as weapons, handcuff keys, cash, paperclips, razors, cell phone SIM cards, and tobacco or marijuana cigarettes, are items that can be small enough to be effectively hidden in braids or dreadlocks. Transcript, Vol. 1 at 11; Vol. 2 at 240; Transcript, Vol. 3 at 9.

114.    Even with religious items, some offenders will exploit opportunities to smuggle contraband. Transcript Vol. 1 at 134.

115.    In TDCJ, male offenders have been coerced into hiding contraband by security threat groups, prison gangs, and other individual offenders. Transcript, Vol. 3 at 67–68.

116.    Offenders can use long hair to conceal contraband, such as handcuff keys. Transcript, Vol. 2 at 240; Transcript, Vol. 3 at 68.

117.    Although both male and female offenders have been caught with all types of contraband, the types of contraband that female offenders are most commonly caught with is cosmetics. Transcript, Vol. 1 at 257–58; Transcript, Vol. 3 at 62.

118.    Male offenders are much more likely to smuggle contraband that is dangerous, such as cellphones, drugs, and sharpened weapons intended for stabbing. Transcript, Vol. 1 at 257–58; Transcript, Vol. 3 at 62.

119.    When smuggled into and used in prisons, cell phones allow offenders to communicate with the outside world—communication that enables offenders to plan escapes or coordinate criminal activity inside and outside the prison walls. Transcript, Vol. 2 at 24–25, 203, 239.

120.    G2 offenders are often instrumental in the smuggling of contraband due to their unrestricted access to areas of the prison. Transcript, Vol. 2 at 25–26, 41–42.

121.    Female offenders in TDCJ have hidden cosmetics, notes, and pills in their braided hair. Transcript, Vol. 2 at 28, 38.

122.    TDCJ utilizes several types of offender searches, but most commonly visual searches, pat searches, and strip searches. Defendant's Exh. 5 at 3.

123.    It takes approximately ten seconds to search an offender's long hair, if it is not in braids or otherwise pulled back or secured, and assuming the offender is cooperative. Transcript, Vol. 3 at 75.

124.    The number of searches of an offender that are conducted each day depends on the offender's custody level, where he goes within the prison, what activities he is participating in, and other factors. An offender could be pat searched ten or more times in one day. Transcript, Vol. 2 at 192.

125.    If the offender does not move about the unit or attend programming, he may be searched three to five times in one day. Transcript, Vol. 2 at 192.

126.    If a unit is short-staffed, offenders are likely to be searched less frequently than if a unit is fully staffed. Transcript, Vol. 3 at 64.

127.    Some offenders have thick or curly hair, which will make it easier for them to hide items in their hair. Transcript, Vol. 3 at 69.

128.    Offenders can comply with orders to run their fingers through their hair in a manner that avoids revealing items hidden there. Transcript, Vol. 3 at 69.

129.    An offender who works in the craft shop, in an industry job, in the kitchen, or anywhere around equipment will not be able to leave his hair down; he will have to braid it or pull it back in some manner to protect it from equipment. Transcript, Vol. 3 at 71.

130.    Hair that is braided or pulled up will take longer to search, because the offender must take the time to release the braid or unfasten the hair. Transcript, Vol. 3 at 73–74.

131.    Many offenders are no compliant or are not expedient in complying with orders when being searched, which causes delays. Transcript, Vol. 3 at 73–74.

132.    Non-compliance offenders or offenders causing delay during searches distract officers from other offenders waiting to be searched. Transcript, Vol. 3 at 74.

133.    Hair that is braided or fastened together can hide contraband. Transcript, Vol. 2 at 27.

134.    A female TDCJ offender at the Mountain View Unit has attempted suicide by using her long hair to suffocate herself. Transcript, Vol. 2 at 42–43.

**Prison Violence**

135.     Long hair can be used in a fight or as a means of assault. Offenders with long hair will be susceptible to having their hair pulled out, or used as a grabbing point to throw the offender. Transcript Vol. 1 at 82.

136.     If Plaintiffs were the only offenders permitted to have long hair, it would incite jealousy and spite in other offenders, because Plaintiffs would be viewed as receiving special accommodations not afforded to others. This jealousy would make put Plaintiffs at a higher risk of harm by other offenders. Transcript, Vol. 2 at 93, 237.

137.     Gangs and gang-related violence are a persistent problem in Texas prisons, and at the McConnell Unit in particular. Transcript, Vol. 2 at 198.

138.     Hair length can be used to symbolize gang affiliations. Transcript, Vol. 2 at 198.

139.     Older offenders are more vulnerable to violence and physical harm from other offenders. Transcript, Vol. 3 at 47–48.

140.     Offenders with medical limitations or conditions are vulnerable to violence and physical harm from other offenders. Transcript, Vol. 3 at 48.

141.     Offenders who are convicted of sexual offenses involving a child are disliked among offenders. Transcript, Vol. 3 at 49–51.

142.     Offenders who are convicted of sexual offenses involving a child are often targeted and vulnerable to physical violence by other offenders. Transcript, Vol. 3 at 49–50.

143.     Offenders serving sentences for sexual offenses against a child generally keep that information to themselves, and generally try to avoid drawing attention to themselves. Transcript, Vol. 3 at 49–50.

144.     Although an offender may keep his conviction to himself, offenders frequently find ways of finding out. Transcript, Vol. 3 at 51–52.

145.    A male TDCJ offender with long hair is substantially more vulnerable to assault by other offenders than male offenders with hair in compliance with TDCJ's grooming policy. Transcript, Vol. 3 at 31–32, 44.

146.    Long hair provides an attacker with an effective means to seize control of a person's head and pull them to the ground. Transcript, Vol. 3 at 31–32.

## Hygiene

147.    Poor hygiene is a frequent problem in prisons. In a prison setting where thousands of people are living together in close proximity, hygiene is of elevated importance. Transcript Vol. 1 at 89.

148.     Promoting offender hygiene is important due to the enclosed setting of TDCJ prison units.

149.    TDCJ has experienced instances of lice outbreaks in the female prison facilities. Transcript, Vol. 1 at 263.

150.    When a lice outbreak occurs in prison, the lice spreads very quickly. Transcript, Vol. 2 at 8.

151.    TDCJ units receiving intake from county jails routinely experience outbreaks of lice. Transcript, Vol. 2 at 7.

152.    TDCJ has experienced outbreaks of lice in the male intake facilities as well, but not as frequently as the female facilities. Transcript, Vol. 1 at 264. Director Melodye Nelson, who has experience governing male and female prison facilities, attributes the frequency of lice outbreaks with the fact that females are permitted to keep long hair, while male offenders are shaved during the initial intake procedures. Transcript, Vol. 2 at 7–8.

## Escape Risk and Identification

153.    Although successful escapes are uncommon in TDCJ and in prison systems generally, it is perhaps the most feared security threat. The primary mission of TDCJ is to safely incarcerate

convicted felons and to keep the public safe from them. At a fundamental level, this means keeping offenders in prison and preventing escape.

154.    The rarity of successful prison escapes is attributable to strong systematic security policies, staff diligence in adhering to those policies, strong supervisor oversight, and training and auditing to prevent complacency. Transcript Vol. 1 at 91.

155.    No single policy, viewed in a vacuum, prevents escapes. Rather, it is the entire system of policies designed to maintain safety and security, and their proper training and implementation that prevent escapes. Transcript Vol. 1 at 100–01.

156.    Long hair can be used as a means of changing one's appearance, both inside and out of prison. Long hair can be cut off in a matter of moments to immediately altar someone's appearance. An inmate could cut his hair immediately before escaping, thereby avoiding easy identification by officers. In the event of escape, an offender could instantaneously change his hair from long to short and confuse efforts to ascertain him. Transcript Vol. 1 at 93.

157.    Although there are other ways that an offender can change his appearance, prisons must be permitted to minimize those risks by utilizing prophylactic measures. Transcript Vol. 1 at 93. For example, TDCJ does not permit hair dye and does not sell it in the commissary, because it would be another means for an offender to change his appearance. Transcript Vol. 1 at 99.

158.    If isolated security protocols are eliminated one at a time, the security of the prison will be gradually diminished. If each detail that is part of a prison's security protocol is not closely monitored and enforced, that failure can aid in an offender's escape. Transcript Vol. 1 at 92–93.

159.    Quick and accurate identification of offenders inside prison is equally important. An offender who normally has long hair, becomes identifiable by his long hair. Transcript Vol. 1 at 95. If an offender suddenly cut his hair off, then it would be easier for him to engage in misconduct without being easily identified.

160.    Although TDCJ could require an offender to obtain a new identification photograph and identification card if he chose to change his appearance by cutting his hair, that protocol would not aid in preventing an offender from cutting his hair immediately prior to engaging in misconduct in order to avoid identification. Transcript, Vol. 3 at 60–61.

161.    TDCJ policy requires offenders to take a new identification photograph if their appearance changes. If the offender is indigent, then the prison bears the cost of the new identification card. Transcript, Vol. 1 at 155.


**Security and Safety Risks Particular to Plaintiffs**

162.    Plaintiff Cobb works in the craft shop. Plaintiff Goodman and Plaintiff Casey, prior to being medically limited, worked in the kitchen. Transcript, Vol. 1 at 195.

163.    The craft shop and the kitchen are high-risk areas of the prison because of the access to tools and utensils, like knives, that can be dangerous if misused. Transcript, Vol. 1 at 192.

164.    Offenders who work in the craft shop have the ability to earn money by selling their crafts. Those offenders must also maintain some amount of money in their prison account in order to purchase their craft supplies such as pieces of wood for woodworking crafts. Transcript, Vol. 1 at 180; Transcript, Vol. 2 at 22.

165.    Offenders, therefore, generally know that anyone who works in a prison craft shop has money in their prison account. Transcript, Vol. 2 at 23.

166.    Craft shop workers and vocational workers can be targets of manipulation and exploitation because they are known to have access to tools and are known to have money. Transcript, Vol. 1 at 162, 180.

167.    Plaintiff Cobb testified that offenders often ask for such things, knowing that Cobb has access to money and tools. Transcript, Vol. 1 at 179–80.

168.    An offender who is permitted to work around sharp tools in a vocational or industry job presents as much, and perhaps more of a security concern as a maximum custody offender who remains in his solitary cell for twenty-four hours a day.

169.    Offenders with access to many areas of the prison facility are often intimidated, coerced, bribed, or simply asked to smuggle contraband because of their access. Transcript, Vol. 2 at 195–96.

170.    Ms. Palmateer recounted an incident where a minimum-security offender working in the maintenance shop smuggled wire-cutters out to another offender. He passed them to a maximum-custody offender by hiding them on a food tray. That maximum-custody offender then used the wire cutters to facilitate a mass escape and several people were killed in the process. Transcript Vol. 1 at 120–22. Although prison officials may revoke the privileges of the offender who abused them in Ms. Palmateer's example, revoking the minimum-custody offender's participation in the maintenance shop after the mass escape and murder of several people would do little to remedy the failure of the prison to keep people safe. Transcript Vol. 1 at 122–23.

171.    Security protocols are just as important for offenders with lower classification levels, and who are assigned to precarious jobs, like Plaintiffs.

172.    An offender may be used as a "mule" to smuggle contraband, although he will not necessarily be the offender who originally had the contraband, or the intended offender receiving the contraband. Offenders may be used as middle-men to move contraband throughout the prison. Transcript, Vol. 3 at 64–65.

173.    Offenders with access to many areas of the prison are more effective "mules," and are more likely to be intimidated, coerced, bribed, or simply asked to smuggle contraband. Transcript, Vol. 3 at 65, 67.

174.    Plaintiff Casey is more vulnerable to be the target of violence than other offenders because he is an older inmate and because he has a medical limitation that limits his mobility. Transcript, Vol. 3 at 47–48.

175.    Plaintiffs Goodman and Cobb are more vulnerable to physical harm from other inmates due to their older age. Transcript, Vol. 3 at 47–48.

176.    Offenders who are serving sentences for sexual offenses involving children generally stay fairly low key and try not to draw attention to themselves, in order to avoid a discussion about why they are incarcerated. Transcript, Vol. 3 at 49.

177.    Offenders who are known to have committed sexual offenses involving children are more likely to be assaulted by other offenders. Transcript, Vol. 3 at 50–51.

178.    Plaintiffs Goodman and Casey are vulnerable to physical violence because they are serving sentences for sexual offenses involving children. Transcript, Vol. 3 at 49–51; Defendant's Exhs. 42, 44.

179.    If Plaintiffs Goodman, Cobb, and Casey were granted an exception to the grooming policy that is not available to other offenders, it would be viewed as special treatment, which would draw attention to them. Transcript, Vol. 3 at 49–51, 54.

180.    The added attention from having a special exception, combined with their vulnerabilities as older offenders and having medical conditions, would increase the likelihood that they will be the targets of violence from other offenders. Transcript, Vol. 3 at 47–51.


**Gender Differences in Disciplinary Convictions**

181.    The statistics for fiscal years 2013 through 2017 support the trend that male offenders are more violent than female offender populations. Defendant's Exh. 13.

182.    For Fiscal Years 2013 to 2017 combined, male offenders were convicted of the following disciplinary infractions: 268 attempted escapes, 2,256 fights or assaults involving a weapon, 13,356 assaults or fights without a weapon, 2,729 assaults of officers with a weapon, 22,883 assaults of officers without a weapon, 4,091 for participating in a riot, 6,371 felonies, 161,987 for possession of contraband, and 45,987 offender fights. Transcript, Vol. 1 at 243; Defendant's Exh. 13.

183.    In Fiscal Years 2013 to 2017 combined, female offenders were convicted of the following disciplinary infractions: 10 attempted escapes, 355 fights or assaults involving a weapon, 1,855 fights or assaults without a weapon, 221 assaults of an officer with a weapon, 1,323 assaults of an officer without a weapon, 28 for participating in a riot, 18 felonies, 24,908 for possession of contraband, and 4,880 offender fights. Transcript, Vol. 1 at 243; Defendant's Exh. 13.

184.    Generally, male offenders are more violent than female offender populations. Transcript, Vol. 2 at 231–32.

185.    Male offenders are 27.5 times more likely to be convicted of a disciplinary infraction for attempting to escape than female offenders. Transcript, Vol. 1 at 252–53.

186.    Male offenders are 31 times more likely to be convicted of a disciplinary infraction for assaulting an officer causing a serious injury than female offenders. Transcript, Vol. 1 at 255.

187.    Male offenders are 146 times more likely to be convicted of a disciplinary infraction for participating in a riot than female offenders. Transcript, Vol. 1 at 256–57.


**Administrative Costs**

188.    TDCJ pays out several million dollars per month in overtime for correctional staff. Transcript, Vol. 3 at 37. For example, in July 2018, TDCJ paid approximately nine million dollars in overtime. Transcript, Vol. 3 at 37, 40.

189.    As of the time of trial, TDCJ had 3,700 unfilled correctional officer positions. Transcript, Vol. 3 at 37–38.

190.    It costs $3.61 to produce a TDCJ offender ID card. If an offender is indigent, the State pays for the ID card. Transcript, Vol. 2 at 48–49.

191.    TDCJ offender ID cards are generally re-issued every three (3) years. Transcript, Vol. 2 at 45.

192.    A male TDCJ offender who substantially alters his physical appearance before the three (3) year ID issuance period has lapsed is required to take a new picture and have a new card issued. Transcript, Vol. 2 at 45–46.

193.    Searching a male TDCJ offender's long hair adds additional time to each long-haired offender search. Transcript, Vol. 3 at 75.

194.    When TDCJ changed the grooming policy to allow offenders to wear beards up to four inches long, an additional administrative position for each unit was hired to process religious beard requests and take additional identification photographs. Transcript, Vol. 2 at 193.

195.    With the change in the grooming policy with respect to beards, TDCJ endured a cost and an administrative burden to take new offender photographs and re-print new ID cards. The burden was more than the normal processes could endure, so the IT department of TDCJ afforded the man hours and resources to accomplish the influx of demand. Transcript, Vol. 3 at 62.

196.    For a TDCJ correctional officer to conduct a diligent search of an offender's long hair, that correctional officer would need to spend an additional five to ten seconds beyond the time that the search would take if the offender did not have long hair. Transcript, Vol. 2 at 96–97; Transcript, Vol. 3 at 75.

197.    Assuming a minimum of four pat searches per offender, per day, it would take an additional forty seconds per long-haired offender per day at a minimum. Transcript, Vol. 3 at 76. That equates

to an additional 14,600 seconds (243.3 minutes or approximately four hours) of searching for every long-haired offender per year. Transcript, Vol. 3 at 76.

198.    If only 5,000 offenders chose to wear long hair in TDCJ, then 20,277.8 hours per year or 55.6 additional staff hours per day would be needed to accommodate the added time for searches. Transcript, Vol. 3 at 78.

199.    Because TDCJ already struggles to fill its available officer positions, it is reasonable to extrapolate that TDCJ cannot simply hire additional staff to account for more than 20,000 hours of additional searching that would need to be performed annually if 5,000 offenders chose to wear long hair. Transcript, Vol. 3 at 78. That time would be time that must be taken away from performing other tasks. Transcript, Vol. 3 at 78.

200.    If TDCJ experienced the same number of requests to grow long hair as it did when it changed the grooming policy to allow religious beards, then TDCJ would be searching long hair for over 84,000 offenders. Transcript, Vol. 3 at 78; Defendant's Exh. 9.

201.    An additional ten seconds per search, four times per day, 365 days per year, for 84,000 offenders amounts to 340,666.67 hours of search time annually. Transcript, Vol. 3 at 79.

202.    If 84,000 male TDCJ offenders adopted long hair, 933.3 additional staff hours per day would be needed system-wide to accommodate the added time for searches.


## PROPOSED CONCLUSIONS OF LAW

The parties do not contest the sincerity of Plaintiff Goodman, Plaintiff Cobb, and Plaintiff Casey's religious belief that they should wear the hair on their heads long. The Court, therefore, presumes that Plaintiffs Goodman, Cobb, and Casey have a sincere religious belief in the injunctive relief that they are seeking—to wear the hair on their heads long.

The parties do not contest that Plaintiff's sincere religious beliefs relating to head hair are substantially burdened by TDCJ's current grooming policy, which does not permit Plaintiffs to grow their hair long. The Court, therefore, presumes that the grooming policy substantially burdens Plaintiffs' religious exercise.

TDCJ has a compelling government interest in safety, security, and operating the prison within its budget. The grooming policy furthers this compelling governmental interest.

TDCJ has a compelling government interest in being able to quickly and accurately identify offenders on a daily basis within the prison. The grooming policy furthers this compelling governmental interest.

TDCJ has a compelling government interest in being able to quickly and accurately identify offenders in the event of escape. The grooming policy furthers this compelling governmental interest.

TDCJ has a compelling government interest in maintaining the highest level of hygiene within its prisons. The grooming policy furthers this compelling governmental interest.

TDCJ has a compelling government interest in keeping Plaintiffs safe from violence by other offenders. The grooming policy furthers this compelling governmental interest.

TDCJ has a compelling government interest in detecting and preventing contraband in prison. The grooming policy furthers this compelling governmental interest.

TDCJ's compelling interest in keeping Plaintiffs safe from violence would be substantially undermined if only these three plaintiffs were permitted to grow long hair without limitation, while other offenders were not so permitted.

It is not reasonable to extrapolate that only Plaintiffs will want to grow long hair without limitation if the Court ordered TDCJ to grant Plaintiffs an exception to the current grooming policy.

It is not reasonable to extrapolate that only Native American faith offenders would want to grow long hair without limitation if the Court ordered TDCJ to grant Plaintiffs an exception to the current grooming policy.

Offenders from many religious groups and offenders with no religious beliefs will request the same exemption to the grooming policy. To deny these offenders an exception from the grooming policy while granting that exception to Plaintiffs would lead to offender envy towards Plaintiffs and anger towards TDCJ. These feelings among the offender population—and the resulting change in offender behavior—would materially undermine TDCJ's compelling governmental interest in maintaining safety, security, and order.

Because female offenders present different security concerns than male offenders, TDCJ's policy treating female and male offenders differently with regard to permissible head hair length does not render TDCJ's male grooming policy underinclusive.

TDCJ's limitations with regard to budget and staffing elevates the importance of quick and accurate offender identification.  Quick and accurate identification would be substantially undermined if offenders were permitted to grow their hair without restriction on length. Re-taking identification photographs when an offender changes his appearance is not an effective alternative to prevent an offender from being able to quickly change his appearance by cutting his long hair (or substantially altering the hair style) after wrongful conduct or following escape.

Because lice can spread so quickly in prison, treating lice after it is found is not an effective alternative to policies that help prevent live in the first place. For this reason, requiring male offenders to have short hair is the least restrictive means of furthering TDCJ's compelling interest in maintaining hygiene in prison.

Searching offenders' long hair several times per day is not an effective alternative of detecting and preventing contraband. The additional time it would take correctional staff to search offenders

with long hair is prohibitive for two reasons: first, there is not enough time in the day for the current officers to add the additional search time without taking time away from other important daily tasks; and second, because TDCJ already suffers staff shortages state-wide, it is not feasible for TDCJ to hire additional staff to account for the additional search time.

Revoking the grooming policy exemption is not an effective alternative to enforcing the policy. Several of TDCJ's compelling governmental interests are unrelated to Plaintiffs' conduct. For example, TDCJ has a compelling governmental interest in protecting Plaintiffs themselves from violence, preventing Plaintiffs from being exploited as contraband mules, and in maintaining hygiene in prison. Revocation does not effectively address these compelling interests.

None of the less restrictive alternatives proposed by Plaintiffs in this case would effectively further TDCJ's compelling governmental interests in safety and security, administrative costs, offender identification, and prison health.

TDCJ's grooming policy, as applied to Plaintiffs, is the least restrictive means for TDCJ to further its compelling interests in safety and security, administrative costs, offender identification, and prison health through its grooming policy.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

SHANNA E. MOLINARE
Assistant Attorney General
Chief, Law Enforcement Defense Division

*/s/ Benjamin L. Dower*
**BENJAMIN L. DOWER**
Assistant Attorney General
Texas State Bar No. 24082931
Southern District ID No. 1742612
benjamin.dower@oag.texas.gov

**Office of the Attorney General**
Law Enforcement Defense Division
P.O. Box 12548, Capitol Station
Austin TX  78711
(512) 463-2080 / Fax (512) 370-9069

**ATTORNEYS FOR DEFENDANT**

## <u>CERTIFICATE OF SERVICE</u>

I, **Benjamin L. Dower**, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing document was filed electronically with the Court and delivered by CM/ECF on October 19, 2018:

**Robert K. Ellis**
Yetter Coleman LLP
909 Fannin
Ste. 3600
Houston, TX 77010
713-632-8000
Email: rellis@yettercoleman.com

**Steven Charles Messer**
Yetter Coleman LLP
909 Fannin
Ste 3600
Houston, TX 77010
713-632-8000
Email: smesser@yettercoleman.com

**ATTORNEYS FOR PLAINTIFFS**

*/s/ Benjamin L. Dower*
**BENJAMIN L. DOWER**
Assistant Attorney General