UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ROBBIE DOW GOODMAN, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:12-CV-166 |
| | § | |
| LORIE DAVIS, *et al*, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Robbie Dow Goodman (Goodman), William Casey (Casey), and Raymond Cobb (Cobb) filed this action against Lorie Davis in her official capacity as Director of the Texas Department of Criminal Justice-Correctional Institutions Division (TDCJ).[1] Plaintiffs seek injunctive relief to require TDCJ to grant them an exemption from its male inmate hair grooming policy so that they may grow their hair long, consistent with their Native American religious beliefs. The case was tried to the bench on August 29 to 31, 2018. Having considered the pleadings of the parties, evidence, and arguments of counsel, the Court makes the following findings of fact and conclusions of law, GRANTING Plaintiffs' requested relief.

### A. Rubric and Standard of Review

Plaintiffs bring this case pursuant to the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000-cc-1 (RLUIPA). Congress enacted RLUIPA to provide

---

[1] A lawsuit against a governmental official in her official capacity is a suit against the state office she serves. *E.g.*, *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978). For ease of reference, Defendant will be referred to herein as TDCJ.

broad protection for religious liberty. *Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015). It provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1. RLUIPA protections are expansive and are to be construed broadly to favor the maximum religious liberty appropriate in an institutional setting. *Holt*, 135 S. Ct. at 860.

There are two phases to the adjudication of a RLUIPA claim. First, Plaintiffs bear the burden of proving that the TDCJ-CID policy implicates the exercise of a sincerely held religious belief and substantially burdens that exercise. *Holt*, 135 S. Ct. at 862 (citing § 2000cc–5(7)(A)). Plaintiffs testified that they had long practiced a form of Native American religion, which requires them to grow their hair long. Among other things, they testified that their hair is considered an extension of their souls, is only to be cut when in mourning, and is essential to being recognized and accepted by their ancestors in the afterlife. The TDCJ policy requires Plaintiffs to cut their hair short on a regular basis, without reference to any life event or cause for mourning. The policy clearly requires them to engage in conduct that violates their religious beliefs.

Failure to comply with the grooming policy will result in significant disciplinary action, a scenario that satisfies Plaintiffs' burden of proof to demonstrate a substantial burden on their exercise of religion. TDCJ has stipulated that Plaintiffs have met their

burden of proof on the initial phase of the inquiry. D.E. 281 at 3, 7. Therefore, this case focuses only on the second phase of the RLUIPA inquiry.

In the second phase, the burden of proof shifts to TDCJ to show that its refusal to allow Plaintiffs to grow long hair (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. *Id*. at 863 (quoting § 2000cc–1(a)). Under RLUIPA, this inquiry is plaintiff-specific, requiring the Court to focus on the application of the challenged policy to the particular claimant whose religious exercise has been burdened. *Id*. at 863. The argument that an exemption in a particular case will lead to other exemptions was rejected by the Supreme Court in *Holt* as "another formulation of the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions." *Id*. at 866 (internal quotation marks omitted).

The Court should give appropriate respect to the expertise of prison officials. However, this does not call for unquestioning deference. *Id*. at 864. The Court is free to disregard testimony of prison experts where there is conflicting evidence. *Ali v. Stephens*, 822 F.3d 776, 789 (5th Cir. 2016). This is especially true where conflicting testimony comes from the TDCJ's own witnesses. *Id*. And any prison official's testimony may be tested against the policies and practices of other prison systems to see whether a persuasive reason exists to deny a religious accommodation. *Holt*, 135 S. Ct. at 866.

**B. The Policy**

TDCJ's male grooming policy requires Plaintiffs to cut their hair, violating their religious beliefs and prohibiting the religious practice of wearing long hair. The policy states:

> Male offenders shall keep their hair trimmed up the back of their neck and head. Hair shall be neatly cut. Hair shall be cut around the ears. Sideburns shall not extend below the middle of the ears. No block style, afro, or shag haircuts shall be permitted. No fad or extreme hairstyles/haircuts are allowed. No mohawks, tails, or designs cut into the hair are allowed.

D.E. 281 at 3. Plaintiffs seek an exception to allow them to wear long, unbraided, loose hair in accordance with their religious beliefs. However, Defendant makes no exception for male inmates who seek to wear long hair on religious grounds. D.E. 281 at 4.

In contrast, TDCJ allows all female inmates to wear their hair without length restrictions. D.E. 281 at 4. The reason TDCJ allows women to have long hair is because it views women having long hair as an accepted cultural norm. TDCJ conceded that the disparity in the male and female grooming policies is not connected to any difference in the propensity for violence, to smuggle contraband, or to facilitate proper hygiene between men and women.

With respect to county jails in Texas, the Texas Administrative Code contains standards for correctional facilities. The Texas Commission on Jail Standards' policy allows county jail inmates to wear long hair and only permits the jail to require a haircut when "clearly justified for health or sanitary reasons." 37 Tex. Admin. Code § 277.7. This is consistent with the industry standard of incarceration throughout the country. The vast

majority of jurisdictions in the United States allow male inmates to have long hair.  D.E. 281 at 5.  Only eight states in the United States ban male inmates from having long hair: Alabama, Florida, Georgia, Louisiana, Mississippi, South Carolina, Texas, and Virginia. *Id*.

### C. Plaintiffs' Expert, Joan Palmateer

Plaintiffs offered the testimony of Joan Palmateer as an expert.  She began her 32-year career as a correctional officer in the Oregon Department of Corrections and worked her way up in the system through positions involving mentoring, training, and policy formation.  She wrote post orders that instructed correctional officers and prison staffers on how to perform their daily work, including how often they search inmates, how often they perform counts, and how to respond to emergencies.  She rose through the ranks and became an assistant superintendent, taking charge of different types of prison facilities.

Eventually, Ms. Palmateer became Chief of Security for the Oregon Department of Corrections, with statewide authority.  She then became warden of the Oregon State Men's Penitentiary, a super-max prison that included death row, administrative segregation, a mental health facility, as well as general population.  Later, she had an opportunity to open a new women's prison and male intake facility where she was able to define the prison culture by selecting her own staff and establishing parameters for all of the operations from inception.  Upon being promoted to the central office as Administrator, she began supervising all superintendents and wardens in the Oregon Department of Corrections.  She helped write the curriculum for training new wardens and superintendents on all things they need to know in the first six months of assuming their respective leadership positions.

In connection with her associated work for the National Institute of Corrections, Administrator Palmateer created security audit policies and standards, the instruments used to conduct security audits, and audit training for her department. A security audit is a total risk assessment for an institution within an agency. She personally performed audits of prisons in forty-eight states. She also conducted staffing assessments and critical incident reviews. The Court accepted Administrator Palmateer as an expert in prison industry standards, prison administration generally, and prison security specifically, including health issues, budgetary matters, and inmate identification.

Throughout Administrator Palmateer's work, the Oregon prisons allowed both male and female inmates to wear long hair. She is personally familiar with multiple state policies and the security status of their prisons—both those that allow and those that do not allow male prisoners to wear long hair. And while she never before testified on behalf of an inmate, she agreed to testify in this case because she understands from her personal experience and expertise that the ability to practice a religious faith is important to the correction system's goal of rehabilitation of inmates. The practice of a religion causes inmates to actively engage in an activity that is both meaningful and provides perspective. She testified clearly and confidently, such that the Court deems her testimony to be highly credible and authoritative.

### D. Compelling Governmental Interest.

Defendant argues that the TDCJ male grooming policy is necessary to further the following governmental interests: preventing the smuggling of contraband; eliminating a means to commit suicide or perpetrate violence; preventing an escaped inmate from easily

changing his appearance; reducing incidents of adverse health and sanitation issues; and controlling budgetary costs associated with frequent inmate searches. The evidence did not support those arguments in the abstract or with respect to Plaintiffs. TDCJ's claims are further undercut by the underinclusive nature of its male grooming policy as compared to the female grooming policy and TDCJ's allowance of other religious exemptions that are more troubling than long hair.

### 1. Smuggling Contraband

TDCJ claims that long hair is conducive to smuggling contraband. However, it has not tracked such incidents or maintained any statistics to support its claim, despite the six and one-half-year pendency of this case. Although long hair is permitted among female inmates and female inmates are known to smuggle items at higher rates than men, TDCJ has not shown how often—if at all—long hair has been found to facilitate contraband smuggling within that population. Instead, TDCJ Director Lorie Davis testified that she has never seen contraband in loose, long hair, and the only contraband she has seen in braided hair was non-dangerous or "nuisance" contraband.

This is consistent with the testimony of Administrator Palmateer, who stated that prisons allowing long hair do not have higher instances of smuggling contraband than prisons that prohibit long hair. She testified that inmates prefer hiding places where contraband can be more easily and securely hidden, such as in clothing, on the body, in body cavities, or inside other objects such as books. As a result, inmates do not generally smuggle contraband in long hair, especially in the loose hair at issue here.

TDCJ offered no factual substance to support its claim that loose, long hair facilitates smuggling. In addition, TDCJ does not, in practice, treat hair-related smuggling as a problem compelling a solution. Even though male and female inmates are equally capable of smuggling the same dangerous contraband, female inmates are permitted to wear long hair, including braids. TDCJ Director Melodye Nelson admitted that she even allows female inmates with a known pattern of smuggling contraband to wear long hair.

TDCJ allows various religious exemptions to their policies that provide the same or more significant opportunities to smuggle contraband, such as growing beards and wearing kufis or hijabs. TDCJ also freely allows inmates to carry religious texts such as the Bible or Koran around the prison despite the fact that those books are a better hiding place, are more frequently used for smuggling contraband, can accommodate larger and more dangerous items, and take longer to search. And TDCJ does not revoke religious text-carrying privileges even after an inmate uses one to smuggle contraband.

TDCJ has not demonstrated that its grooming policy furthers any compelling interest of the government to prevent the smuggling of contraband.

## 2. Perpetrating Violence

TDCJ advances three reasons that long hair creates risks of personal injury or death. First, it claims that long hair can be used by an inmate to commit suicide. Second, long hair could be used as a way to hold on to an opponent in a struggle, thus facilitating violent confrontations and increasing injuries among inmates. Third, creating a religious privilege of wearing long hair would engender jealousy and foment more fights targeting Plaintiffs.

**Suicide**.   Neither of the industry experts who testified were aware of anyone using long hair to commit suicide.   TDCJ produced one witness, Director Nelson, who testified that in over ten years of supervising 8,000 female inmates, she is aware of one instance where long hair played a role in an attempted suicide.   The attempt was unsuccessful.   And TDCJ still allows female inmates to wear long hair.

**Fighting Advantage**.   According to the evidence, in facilities that permit male inmates to wear long hair, men have no track record of hair-pulling in their fights.   Rather, it is female inmates who are known to use hair to their advantage.   Despite this unquantified, yet greater incidence of the violent use of hair among females, females may wear long hair in TDCJ facilities.

TDCJ's own witness, Director Nelson, admitted that TDCJ has not observed or made any effort to document a correlation between hair length and violence.   TDCJ does not require even the most violent of women to cut their hair.   This comports with Administrator Palmateer's testimony that allowing long hair does not cause increased violence or injuries in prison.   States that allow long hair have not experienced any such association.   Neither does pulling hair cause greater injury than other forms of fighting that already exist in prison.   Indeed, TDCJ has other rehabilitative programs that it continues, even though the programs pose greater dangers and costs, such as the craft shop that grants access to dangerous tools or outdoor work that increases the risk of smuggling dangerous contraband.

**Jealousy**.   There are many classifications in prison that carry privileges, including the basic security classifications that determine job assignments and access to prison facilities.   TDCJ is required to grant exemptions—privileges—to certain inmates for issues

of grooming, dress, and spiritual practice mandated by RLUIPA. There is no evidence that these existing exemptions cause jealousy and Plaintiffs testified credibly that their requested exemption from the grooming policy would not engender jealousy. For example, Muslim inmates are allowed to observe their religious beliefs by wearing a beard, kufi, or a hijab. Inmates understand that they are not entitled to exemptions for religions that they do not practice and that they are entitled to their own religious exemptions to which others might not be entitled.

**Summation**. None of the reasons TDCJ proffers for resisting Plaintiff's request to wear long hair based on suicide or an increase in violence or injury is supported by the record evidence.

### 3. Escape and Identification

TDCJ asserts that the grooming policy is important to providing uniformity in appearance, preventing escape, and expediting recapture in the event of an escape. Long hair, it argues, makes identification within the prison more difficult and makes it easier for an escaped inmate to alter his appearance. The credible evidence does not support these arguments.

**Prison Identification**. A male inmate having long hair does not make him more difficult to identify in prison. Instead, the rarity of long hair among male populations where long hair is permitted makes identification easier, not harder. It would not be more difficult to identify an inmate with long hair than it would be to identify an inmate with other permitted exemptions such as a beard, kufi, or hijab. And while TDCJ claims that short hair for male inmates is necessary for uniformity, TDCJ does not pursue this alleged

governmental interest in female facilities. TDCJ does not require any uniformity of haircuts among women.

**Escape**. Successful escape attempts, where inmates escape the outer walls of the prison, are very rare. In that rare case, the inmate's success depends on a number of complex factors. The inmate's appearance, including altering that appearance, is rarely one of the factors that contributes to escape. Even then, the length of a prisoner's hair is a much less significant part of their appearance than other parts, such as clothing, glasses, and facial hair. Critical incident audits reflect that staff complacency and a lack of supervision or monitoring, rather than discreet policies, are at fault in prison homicides, escapes, and riots.

Both Administrator Palmateer and Director Nelson testified that long hair does not assist an inmate in escaping prison. In fact, prisons that allow long hair do not have more escapes than prisons that prohibit long hair. And TDCJ, itself, does not require women who have escaped or attempted to escape to cut their hair.

**Recapture**. In the rare case where an inmate is able to escape, the inmate is almost always recaptured. There is no credible evidence that inmates delay capture or evade capture based on having long hair in prison and cutting it after escape. Moreover, any threat of an escaped inmate not matching their wanted poster because they cut their hair can be remedied by requiring inmates to take multiple photos with long and short hair or imitating short hair by pulling the hair back when the photo is taken. TDCJ already takes updated photographs of all inmates every 3 years. Wanted posters with side-by-side photos of escaped inmates with short and long hair are the industry standard response.

TDCJ's reasons for imposing a short hair policy on men in order to make identification easier or to prevent escape and assist recapture are not supported by the evidence. In similar situations, courts have rejected the assertion that grooming policies aid in escape or avoiding recapture. *See Holt*, 135 S. Ct. at 864-65; *Ali*, 822 F.3d at 790. The vast majority of prisons allow male inmates to have long hair without an increase in escapes or longer periods of avoiding recapture, and TDCJ does not show any compelling reason why Texas is or would be different.

### 4. Health and Sanitation

TDCJ complains that long hair is an invitation to lice outbreaks and other undefined challenges to sanitation. However, prisons that allow long hair do not have more problems with disease or general sanitation than prisons that prohibit long hair. In particular, lice outbreaks are fairly rare, occurring primarily in intake units. The McConnell unit is not an intake unit. And prisons have effective systems in place for dealing with lice. In practice, TDCJ does not treat the risk of head lice as a reason to require female inmates to cut their hair—even when they suffer from it.

The evidence does not support TDCJ's claim that its male grooming policy furthers the government's interest in the health of the inmates.

### 5. Budget and Inmate Searches

TDCJ complains that long hair increases the time it takes to search prisoners. And because the security of the prison requires frequent searches as inmates move around the facility, the incremental increase in search time quickly adds up and creates significant staffing issues in a system that is already understaffed. TDCJ has overstated the problem.

This case is addressing the request of only three inmates. If TDCJ relies on the alleged burden posed by other inmates, it has not supported its position with any estimate regarding how many inmates might request a long hair exemption as practitioners of the Native American faith or any other faith that calls for wearing long hair. At the time of trial, there were 5,617 inmates identifying as Native American in the entire TDCJ population of approximately 148,000, which is less than four percent of the prison population. The TDCJ testimony did not break down how many Native Americans are female and not subject to a short hair grooming policy or how many are housed in the McConnell unit, which can house 2,750 inmates.

TDCJ did not do any polling of how many males might seek to practice the faith and wear long hair in the future. In fact, the evidence was that the number of inmates practicing the Native American faith in prison is small, with even fewer attending services. The ambient climate of the McConnell Unit, which is not air conditioned in the South Texas summer, is also a natural disincentive to wearing long hair and might affect the number of men who opt to claim their exemption.

To assess the economic burden of searching long hair, TDCJ sought to show how much additional time it takes to search inmates wearing long hair. The credible evidence indicated that searching long hair takes three to ten seconds, as it involves requiring the inmate to shake his hair out while running his hands through it. However, according to Administrator Palmateer, it is not appropriate to isolate discreet parts of a search and assign them separate blocks of time. Searching is, instead, an integrated process that would not require additional staffing. Inmates can be required to prepare their hair (if it has been

braided or put up) as they line up for search, such that the preparation time does not increase the search time. Searching long, loose hair is not difficult and can easily be incorporated into the structure of existing search types and the existing duties of correctional officers and their training.

TDCJ already requires both male and female inmates to bend forward and back and run their fingers through their hair in an ordinary search. And training on how to search long hair on male inmates can be easily incorporated into TDCJ's regular, frequently conducted training sessions for correctional officers. The searches associated with long hair will not require the hiring of additional security officers or the purchase of expensive equipment. Nor would processing applications for the long hair exemption cause significant additional expense because TDCJ already employs clerks at the McConnell unit to process religious exemptions such as these, as required by law.

Any budgetary cost would be the same or less than other religious accommodations that TDCJ has allowed. For instance, Christians, which make up a much larger portion of the population than Native Americans, are permitted to carry a Bible, which takes more time to search than long, loose hair. Likewise, there is no credible evidence that more inmates (or even the same number of inmates) would request a long-hair exemption than have requested a beard exemption, which the TDCJ has already successfully allowed without significant budgetary, health, or safety costs. There is no evidence that the exemption Plaintiffs seek would pose greater costs than the beard exemption.

Many of the jurisdictions that allow long hair have the same or less money to spend per inmate than Texas. By way of example, Nevada, Oklahoma, Arkansas, Kentucky,

Indiana, Idaho, Missouri, South Dakota, and Utah have the same or fewer resources on a per-capita basis than Texas. Texas does not have a lower inmate-to-guard ratio, nor is it otherwise more understaffed, than other states. And female facilities are not staffed at a higher level than male facilities on the basis that searching long hair takes more time.

On the opposite end of the spectrum, there is no evidence that states that allow long hair and have a higher budget per inmate spend more money to accommodate the grooming policy. To the contrary, industry experts on both sides indicated that there are no increased costs based on a policy allowing long hair and no saved costs based on a policy requiring short hair. Instead of a difference in staffing ratios, those jurisdictions tend to spend their funds on increased salaries and expenses. There is no competent evidence that the size and geography of Texas provides unique challenges with respect to searching long hair that requires additional funds.

Even if TDCJ were to incur some amount of cost differential to permit long hair, that, by itself, does not satisfy the TDCJ's burden of proof to show a compelling state interest. "Congress stated that RLUIPA 'may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise.'" *Holt*, 135 S. Ct. at 860, 866 (quoting § 2000cc–3(c)) and rejecting the argument that an exemption should be denied because of the large number of inmates who might claim it).

TDCJ has not met its burden to show that its male grooming policy furthers the government's interest in reducing the time and cost associated with inmate searches.

### 6. Underinclusiveness Defeats Compelling Interest

TDCJ's evidence does not support the compelling interests it claimed in defending its grooming policy. Part of the calculus, noted above, is that its claims are eroded by the fact that its policy is underinclusive.

> A policy is underinclusive if it fails to cover significant tracts of conduct implicating its animating and putatively compelling interest. If a policy is underinclusive, this fact can raise with it the inference that the government's claimed interest isn't actually so compelling after all. Underinclusive-ness is problematic because a law cannot be regarded as protecting a compelling interest when it leaves appreciable damage to that supposedly vital interest unprohibited. If a policy is underinclusive, the prison must provide an adequate explanation for its differential treatment in order to avoid the conclusion that the policy does not serve a compelling interest.

*Ware v. Louisiana Dep't of Corr.*, 866 F.3d 263, 268–69 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1181 (2018) (citations, quotation marks, brackets, and ellipses omitted).

As noted in discussing each of TDCJ's claims to a compelling interest, above, the male grooming policy is underinclusive in that female inmates are not subject to the same short-hair policy—despite their own capacity for smuggling, violence, escape, contracting lice, and even greater search requirements, given that they are not required to wear long hair in a loose style. The only explanation given for this divergent treatment is the accommodation of social norms. TDCJ did not provide any evidence that its interest in perpetuating social norms also served any penological interest or neutralized the concerns that it claims animates its male grooming policy.

The policy is also underinclusive in that concerns regarding violence, smuggling, and misidentification that counsel against other religious exemptions have not prevented those

exemptions, such as TDCJ's allowance of beards, kufis, and hijabs. TDCJ also invoked social norms to justify allowing religious texts, which not only provide a better means for smuggling dangerous weapons and take longer to search, but can themselves be used as weapons. The evidence shows that those religious accommodations present a greater risk to prison security, but they are permitted. TDCJ did not attempt to explain why those religious exemptions were acceptable while long, loosely-worn hair is not.

The evidence also shows that Texas does not require that its jails follow the same male grooming policy used in its prisons, even though the state has the power to do so. There is nothing in the record about the difference between jails and prisons that justifies this disparity. In particular, these three Plaintiffs spent many months or years in Texas jails prior to transferring to TDCJ prisons, and were allowed to wear long hair during their respective jail incarcerations without incident. Defendant's hair policy is, therefore, underinclusive for this additional reason. *See Ware*, 866 F.3d at 270 (policy underinclusive where it did not apply equally in jails and prisons).

In all of these ways, TDCJ's male grooming policy is underinclusive. TDCJ has failed to explain why its deference to social norms is appropriate in the prison setting and overrides the penological interests it claims.

### 7. These Plaintiffs

The request of these three Plaintiffs does not present any particular danger to TDCJ's order or security. The Plaintiffs' age, health, disciplinary histories, and prior experience of incarceration with long hair in Texas jails show they are not at significant risk of smuggling

contraband, perpetrating violence, attempting escape, contracting lice, or holding up search lines.

TDCJ separates inmates into five different custody levels based on the security risk of each inmate. Plaintiffs are each G2 custody inmates, which is the second lowest security risk group status. TDCJ uses its custody designation in determining various freedoms and privileges offered to each inmate. Inmates that are violent or that commit major disciplinary infractions are moved into a higher custody level. Because Plaintiffs are classified as G2, TDCJ has granted them significantly more privileges and freedoms than inmates of higher classifications, including freedom of movement throughout the prison, access to more types of employment, and the ability to live in dorms.

**Plaintiff Casey**. Plaintiff Casey is of Cherokee descent and was fifty-nine years old at the time of trial. Throughout the twenty-six years that he has been incarcerated in G2 custody, he has never received a major disciplinary infraction and never participated in behavior that caused his custody status level to be increased. More specifically, he has had no infractions for possession of drugs or weapons, fighting, or attempted escape, and has not been the target of violence. Before transferring to TDCJ, Casey spent two and a half years incarcerated in a Texas jail where male inmates are allowed to have long hair. Casey wore his hair long during that period of his incarceration, without any incidents of contraband, escape attempts, lice outbreaks, or violence from the long hair. Casey has always observed, and continues to observe, appropriate personal hygiene habits and does not present any health risks related to wearing long hair.

**Plaintiff Cobb**.  Plaintiff Cobb is of Cherokee, Powhatan, and Iroquois descent and was 42 years old at the time of trial.  Incarcerated for over twenty years, he was initially placed in G3 custody status, which was improved to G2 in March 2007.  Throughout his incarceration, Cobb has never participated in behavior that caused his custody status level to be increased.  Over the last ten years, Cobb has received only two minor disciplinary infractions, no major infractions, has had no infractions for possession of drugs or weapons, fighting, or attempted escape, and has not been the target of violence.  Before transferring to TDCJ, Cobb spent a year and a half incarcerated in a Texas jail where male inmates are allowed to have long hair.  Cobb wore his hair long during this period, without any incidents of contraband, escape attempts, lice outbreaks, or violence associated with his long hair.  Cobb has always observed, and continues to observe, appropriate personal hygiene habits and does not present any health risks related to wearing long hair.

**Plaintiff Goodman**.  Plaintiff Goodman is of Cherokee descent and was 53 years old at the time of trial.  He has been incarcerated for over twenty-two years, with a custody level of G2.  Over the last ten years, Goodman has not participated in any behavior that caused his custody status level to be increased, has no major disciplinary infractions, has had no infractions for possession of drugs or weapons, fighting, or attempted escape, and has not been the target of violence.  He has had several minor infractions, none of which were demonstrated to counsel against an exemption to wear long, loose hair.  Before transferring to TDCJ, Goodman spent six months incarcerated in a Texas jail where male inmates are allowed to have long hair.  During this period of his incarceration, he wore his hair long, without any incidents of contraband, escape attempts, lice outbreaks, or violence associated

with long hair. Goodman has always observed, and continues to observe, appropriate personal hygiene habits and does not present any health risks related to wearing long hair.

**Plaintiffs, Generally**. Statistically speaking, these three Plaintiffs present a very low risk of violence, smuggling contraband, and attempting escape—lower than the average female inmate. Even if the evidence had supported a finding that long hair significantly increased these risks, TDCJ offered no evidence that these particular Plaintiffs would succumb to those risks. Neither is there any evidence that allowing these three Plaintiffs to wear long hair will increase the incidence of head lice or impose significant budgetary costs related to searches. Finally, the threat of an inmate's ability to grow long hair being revoked is an effective tool for discouraging abuse of the privilege and for promoting positive behavior such as proper grooming.

### 8. Conclusion

TDCJ has the burden to show that the male grooming policy that prohibits an inmate from growing long hair serves a compelling governmental interest. *Holt*, 135 S. Ct. at 863. The evidence does not support the proposition that the policy furthers any of the safety, security, health, or budgetary interests it has alleged. The Court **FINDS** that the policy does not serve a compelling state interest.

### E. Least Restrictive Means

Under RLUIPA, the government's burden is to show both (1) the policy furthers a compelling governmental interest, and (2) the policy is the least restrictive means for furthering that interest. 42 U.S.C. § 2000cc. Because the test is conjunctive, TDCJ's failure to show that the policy furthers a compelling governmental interest obviates the need to

consider the least restrictive means test.[2]   However, because the record makes the issue abundantly clear, the Court sets out its resolution as an alternative basis for its ruling.

"The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal other than the challenged policy." *Ware*, 866 F.3d at 269 (citations and quotation marks omitted).   Courts have recognized that revocation of a privilege is the least restrictive means of furthering interests in a number of contexts.   *See Holt,* 135 S. Ct. at 867 (institution could withdraw beard accommodation if abused); *Ali*, 822 F.3d at 795 (Texas prison could revoke beard and kufi privileges as least restrictive means).   A revoked privileged can no longer be abused. TDCJ has not offered any evidence or argument to suggest that the ability to revoke the privilege is insufficient to promote its interests.   Rather, the credible evidence shows that the threat of revocation can deter bad behavior because inmates value the privileges they receive.

TDCJ's policy is also not the least restrictive means because the vast majority of states allow long hair, and TDCJ has offered no credible reason for Texas to have a different policy.

> "[W]hen so many prisons offer an accommodation, a prison must, at minimum, offer persuasive reasons why it believes that it must take a different course."   Accordingly, in the face of evidence of contrary policies, we may not defer to prison officials' "mere say-so that they could not accommodate the plaintiff's request" because these other policies indicate that a less restrictive means may be available.

---

[2]   *See generally, Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) (after addressing identical language in the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1, the Court concluded its opinion after finding no compelling governmental interest).

*Ware*, 866 F.3d at 269 (citing *Holt*) (quotations omitted).

Evidence at trial showed that the vast majority of states, the entire Federal Bureau of Prisons, and even jails within Texas allow inmates to wear long hair. Texas is only one of eight states that do not allow men to have long hair in their prison system. TDCJ has offered no persuasive reason why Texas is unique in needing to deny long hair. The Fifth Circuit has held that the exact same disparity in long hair policies rendered Louisiana's hair policy not the least restrictive means. *See Ware*, 866 F.3d at 273.

Other measures provide solutions to some of the problems TDCJ has alleged. For instance, with respect to any health or sanitation issue, a less restrictive policy would be to allow long hair, but require recipients of the exemption to regularly wash their hair, noting that grooming issues are not a problem in female prisons. With respect to the identification issue, TDCJ could easily provide pictures of an inmate with long and short hair on escape fliers. *See Holt*, 135 S. Ct. 865 ("[T]he Department could largely solve this problem by requiring that all inmates be photographed without beards when first admitted to the facility and, if necessary, periodically thereafter."). And as Administrator Palmateer suggested, TDCJ could take pictures of the inmates with their long hair pulled back to simulate short hair.

Even if it requires TDCJ to expend more resources to manage the male inmates that desire to wear long hair as a religious practice, "Congress stated that RLUIPA 'may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise.'" *Holt*, 135 S. Ct. at 860.

**CONCLUSION**

For the reasons set out above, Plaintiffs are entitled to judgment against Defendant enjoining TDCJ from enforcing its male grooming policy against Plaintiffs with respect to the rules preventing inmates from growing their hair long and wearing it loose. Plaintiffs are further entitled to reasonable attorney's fees and costs as prevailing parties. Plaintiffs shall file their motion for entry of judgment with a proposed final judgment on or before **February 25, 2019**. Plaintiffs may file their motion for attorney's fees in the manner and by the date permitted by the Federal Rules of Civil Procedure.

ORDERED this 24th day of January, 2019.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE